## UNITED STATES v. CENTRAL STOCKHOLDERS' CORPORATION OF VALLEJO et al.

### No. 6422.

Circuit Court of Appeals, Ninth Circuit.
Aug. 29, 1931.

Samuel W. McNabb, U. S. Atty., and Ignatius F. Parker, Asst. U. S. Atty., both of Los Angeles, Cal., and J. F. Lawson, Sp. Asst. to U. S. Atty., of Washington, D. C., for the United States.

Milton T. Farmer, A. E. Chandler, Philip H. Angell, Orville R. Vaughn, Erwin C. Easton, and Athearn, Chandler & Farmer, and Frank R. Devlin, all of San Francisco, Cal., for appellees Central Stockholders' Corporation of Vallejo and C. S. Howard Co.

Edward F. Treadwell, of San Francisco, Cal., for appellee Southern California Edison Co.

Before WILBUR and SAWTELLE, Circuit Judges, and NETERER, District Judge.

WILBUR, Circuit Judge.

Preliminary to the statement of facts, we quote from the appellant's brief its statement of the nature and purposes of the action, without adopting that statement:

"This is a suit by the United States.

"(1) To quiet title to public lands and to the use of the waters thereof; and

"(2) To determine and enforce the right of the United States to regulate and use the waters of the San Joaquin River.

"(a) For power purposes on its riparian lands, under its constitutional power to dispose of the public domain, and

"(b) For navigation purposes on the lower part of said stream, under the authority of the commerce clause of the constitution of the United States."

Fundamentally the question presented by appellant's brief is the right of the United States and its authorized licensees to impound, during the period of high water, the water of the rivers and streams having their sources in the public domain for the purpose of developing hydroelectric power and of regulating the flow of navigable streams. Avowedly this action was instituted in the federal courts by the appellant, which will hereinafter be referred to as the government, in order to avoid the effect of the law of California with reference to water rights as established by its legislation and judicial decision. The government admits that in the Herminghaus Case (Herminghaus v. Southern California Edison Co., 200 Cal. 81, 252 P. 607) the Supreme Court of California has established as the law of California riparian rights in and to the waters of the San Joaquin river and other streams inconsistent with the claims of the government in this action. The claim of the government may be summarized as follows:

The government, by reason of its ownership of the public lands within the state of California, is entitled to the use of the water in the streams bordering on or flowing through such lands by reason of the common-law right of owners of riparian lands to such water; that this right includes the right to

store water for the generation of hydroelectric power, as its permittee in this case proposes to do by virtue of governmental license; that the state of California under the Enabling Act (9 Stat. 452) is powerless to modify the proprietary right of the government in such streams by either legislation or judicial decision; that the decision of the Supreme Court of the State of California in the Herminghaus Case is inconsistent with the common-law rights of an upper riparian owner and is therefore ineffective to determine the right of the government.in and to waters rising in or flowing to or along the public lands of the United States. We are thus asked by the government to re-write the water law of California as developed by its courts to the extent, at least, of holding that the large body of public land riparian to the streams of the state has rights entirely distinct from those defined and recognized by the law of the state of California. Formidable as is the task thus presented with reference to the law of California, the contention made here would be even more discordant with the laws of the other states of this circuit which have not recognized the common-law right of riparian ownership and have consistently based their law of water rights upon the appropriation of water (Arizona, Nevada, Montana, Idaho). If it be true that the government, by reason of its ownership of large tracts of public lands, has a corresponding common-law right to the water of the streams as a part and parcel of land, and that such water cannot be taken away by state legislation or judicial decision, the result of the government's contention would in such other states be even more disastrous to private ownership of water than it would be in the state of California, which has always recognized the rights of the riparian owner in and to the waters of streams. At the same time the doctrine of appropriation is also applied in appropriate cases. See Lux v. Haggin, 69 Cal. 255, 4 P. 919, 10 P. 674; 25 Cal. Jur. (Waters) §§ 3 to 7, inc.; § 58 and authorities there cited; Cal. Civil Code, §§ 1410–1422. In addition to the rights thus asserted by the government on account of its ownership of public lands, the government is also asserting its sovereign right to control the flow of the San Joaquin and other navigable rivers in aid of commerce and navigation. It is assumed by the parties that the Attorney General of the United States has power to bring this action involving, as is claimed, the title of the government to the waters rising on or flowing through public lands, and for the purposes of the decision we will make a like assumption, although it would seem that, in a matter of such far reaching importance to so many states and to such a multitude of private owners or claimants, a special act of Congress authorizing such a suit would be appropriate. In the government's brief, it is asserted that: "If the United States looks unconcernedly on, while rights which it claims to own are being litigated and adjudged to be the property of others, it would be folly to expect any trace of its title to be discovered by the courts of equity fifty years later."

This statement is made in support of the claim of necessity of action by the government at this time to prevent the acquisition by the appellee Central Stockholders Corporation of Vallejo of title to the waters of the San Joaquin river as recognized and declared by the Supreme Court of the State of California in the Herminghaus Case. It is equally applicable, however, to the situation presented by the record where litigation has been commenced after the government has stood by for more than seventy-five years and allowed the courts of the state to develop its water law and water rights without objection. The rights to water in streams flowing from or on public lands have largely been the result of local custom and laws, acquiesced in by the government, acknowledged by the decisions of the Supreme Court and ratified by Congress, both by direct legislative approval and by inferences legitimately resulting from legislation dealing with public lands. Basey v. Gallagher, 20 Wall. (87 U. S.) 670, 22 L. Ed. 452; Atchison v. Peterson, 20 Wall. (87 U. S.) 507, 22 L. Ed. 414; Forbes v. Gracey, 94 U. S. 762, 24 L. Ed. 313; Jennison v. Kirk, 98 U. S. 453; 25 L. Ed. 240; Broder v. Water Co., 101 U. S. 274, 25 L. Ed. 790; Act of Congress July 26, 1866, § 9, 14 Stat. 253 (43 USCA § 661); 19 Stat. 377, § 1, as amended (43 USCA § 321); Black Pomeroy on Water Rights, § 17, p. 22. The general tenor of such decisions and legislation will be indicated by an extended quotation from a comparatively recent decision (1898) by the Supreme Court in the case of United States v. Rio Grande Irrig. Co., 174 U. S. 690, 702–705, 19 S. Ct. 770, 774, 43 L. Ed. 1136:

"The unquestioned rule of the common law was that every riparian owner was entitled to the continued natural flow of the stream. It is enough, without other citations or quotations, to quote the language of Chancellor Kent (3 Kent, Comm. § 439):

" 'Every proprietor of lands on the banks

of a river has naturally an equal right to the use of the water which flows in the stream adjacent to his lands, as it was wont to run (currere solebat) without diminution or alteration. No proprietor has a right to use the water, to the prejudice of other proprietors, above or below him, unless he has a prior right to divert it, or a title to some exclusive enjoyment. He has no property in the water itself, but a simple usufruct while it passes along. "Aqua currit et debet currere ut currere solebat," is the language of the law. Though he may use the water while it runs over his land as an incident to the land, he cannot unreasonably detain it, or give it another direction, and he must return it to its ordinary channel when it leaves his estate.'

"While this is undoubted, and the rule obtains in those states in the Union which have simply adopted the common law, it is also true that as to every stream within its dominion a state may change this common-law rule, and permit the appropriation of the flowing waters for such purposes as it deems wise. Whether this power to change the common-law rule, and permit any specific and separate appropriation of the waters of a stream, belongs also to the legislature of a territory, we do not deem it necessary, for the purposes of this case, to inquire. We concede arguendo that it does.

"Although this power of changing the common-law rule as to streams within its dominion undoubtedly belongs in each state, yet two limitations must be recognized: First, that, in the absence of specific authority from congress, a state cannot, by its legislation, destroy the right of the United States, as the owner of lands bordering on a stream, to the continued flow of its waters, so far, at least, as may be necessary for the beneficial uses of the government property; second, that it is limited by the superior power of the general government to secure the uninterrupted navigability of all navigable streams within the limits of the United States. In other words, the jurisdiction of the general government over interstate commerce and its natural highways vests in that government the right to take all needed measures to preserve the navigability of the navigable water courses of the country, even against any state action. It is true there have been frequent decisions recognizing the power of the state, in the absence of congressional legislation, to assume control of even navigable waters within its limits, to the extent of creating dams, booms, bridges, and other matters which operate as obstructions to navigability. The power of the state to thus legislate for the interests of its own citizens is conceded, and until in some way congress asserts its superior power, and the necessity of preserving the general interests of the people of all the states, it is assumed that state action, although involving temporarily an obstruction to the free navigability of a stream, is not subject to challenge. A long list of cases to this effect can be found in the reports of this court. See, among others, the following: Willson v. Black Bird Creek Co., 2 Pet. 245 [7 L. Ed. 412]; Gilman v. Philadelphia, 3 Wall. 713 [18 L. Ed. 96]; Escanaba Co. v. Chicago, 107 U. S. 678, 2 S. Ct. 185 [27 L. Ed. 442]; Willamette Iron Bridge Co. v. Hatch, 125 U. S. 1, 8 S. Ct. 811 [31 L. Ed. 629].

"All this proceeds upon the thought that the nonaction of congress carries with it an implied assent to the action taken by the state.

"Notwithstanding the unquestioned rule of the common law in reference to the right of a lower riparian proprietor to insist upon the continuous flow of the stream as it was, and although there has been in all the Western states an adoption or recognition of the common law, it was early developed in their history that the mining industry in certain states, the reclamation of arid lands in others, compelled a departure from the common-law rule, and justified an appropriation of flowing waters both for mining purposes and for the reclamation of arid lands, and there has come to be recognized in those states, by custom and by state legislation, a different rule,—a rule which permits, under certain circumstances, the appropriation of the waters of a flowing stream for other than domestic purposes. So far as those rules have only a local significance, and affect only questions between citizens of the state, nothing is presented which calls for any consideration by the federal courts. In 1866, congress passed the Act of July 26, 1866, c. 262, § 9, 14 Stat. 253; Rev. Stat. § 2339:

" 'Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed; but

whenever any person, in the construction of any ditch or canal, injures or damages the possession of any settler on the public domain, the party committing such injury or damage shall be liable to the party injured for such injury or damage.'

"The effect of this statute was to recognize, so far as the United States are concerned, the validity of the local customs, laws, and decisions of courts in respect to the appropriation of water. In respect to this, in Broder v. Water Co., 101 U. S. 274, 276 [25 L. Ed. 790] it was said:

" 'It is the established doctrine of this court that rights of miners, who had taken possession of mines and worked and developed them, and the rights of persons who had constructed canals and ditches to be used in mining operations and for purposes of agricultural irrigation, in the region where such artificial use of the water was an absolute necessity, are rights which the government had, by its conduct, recognized and encouraged, and was bound to protect, before the passage of the act of 1866. We are of opinion that the section of the act which we have quoted was rather a voluntary recognition of a preexisting right of possession, constituting a valid claim to its continued use, than the establishment of a new one.'

"March 3, 1877, an act, chapter 107, was passed for the sale of desert lands, which contained in its first section this proviso, 19 Stat. 377:

" 'Provided, however, that the right to the use of water by the persons so conducting the same on or to any tract of desert land of six hundred and forty acres shall depend upon bona fide prior appropriation; and such right shall not exceed the amount of water actually appropriated and necessarily used for the purpose of irrigation and reclamation; and all surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers, and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining, and manufacturing purposes subject to existing rights.'

"On March 3, 1891, an act, chapter 561, was passed repealing a prior act in respect to timber culture, the eighteenth section of which provided, 26 Stat. 1101:

" 'That the right of way through the public lands and reservations of the United States is hereby granted to any canal or ditch company formed for the purpose of irrigation and duly organized under the laws of any state or territory which shall have filed, or may hereafter file, with the secretary of the interior a copy of its articles of incorporation, and due proofs of its organization under the same, to the extent of the ground occupied by the water of the reservoir and of the canal and its laterals, and fifty feet on each side of the marginal limits thereof; also the right to take, from the public lands adjacent to the line of the canal or ditch, material, earth and stone necessary for the construction of such canal or ditch: provided, that no such right of way shall be so located as to interfere with the proper occupation by the government of any such reservation, and all maps of location shall be subject to the approval of the department of the government having jurisdiction of such reservation, and the privilege herein granted shall not be construed to interfere with the control of water for irrigation and other purposes under authority of the respective states or territories.'

"*Obviously, by these acts, so far as they extended, congress recognized and assented to the appropriation of water in contravention of the common-law rule as to continuous flow.* To infer therefrom that congress intended to release its control over the navigable streams of the country, and to grant in aid of mining industries and the reclamation of arid lands the right to appropriate the waters on the sources of navigable streams to such an extent as to destroy their navigability, is to carry those statutes beyond what their fair import permits. This legislation must be interpreted in the light of existing facts,—that all through this mining region in the West were streams, not navigable, whose waters could safely be appropriated for mining and agricultural industries, without serious interference with the navigability of the rivers into which those waters flow. *And in reference to all these cases of purely local interest the obvious purpose of congress was to give its assent, so far as the public lands were concerned, to any system, although in contravention to the common-law rule, which permitted the appropriation of those waters for legitimate industries.* To hold that congress, by these acts, meant to confer upon any state the right to appropriate all the waters of the tributary streams which unite into a navigable water course, and so destroy the navigability of that water course in derogation of the interests of all the people of the United States, is a construction which

cannot be tolerated. It ignores the spirit of the legislation, and carries the statute to the verge of the letter, and far beyond what, under the circumstances of the case, must be held to have been the intent of congress." (Italics ours).

The Supreme Court in this case was dealing with a situation where the defendant, the Rio Grande Irrigation Company, was threatening to divert all the waters of the Rio Grande river, at a point above its navigable portion, but so as to render the stream innavigable where it had theretofore at all times been navigable, and it was held that by reason of later legislation (1890, 26 Stat. 454, § 10 [33 USCA § 403a]) that if the legislation of 1877 (19 Stat. 377, supra) permitted so great an appropriation, the later legislation (26 Stat. 454, § 10, supra) withdrew that consent.

Whatever the relative power of the state and of the government in the absence of permissive legislation, as stated in the foregoing excerpt from U. S. v. Rio Grande Irr. Co., supra, it is clear that the legislation of Congress above referred to (1866, 14 Stat. 253; 1877, 19 Stat. 377) gave the consent of Congress, "so far as the public lands were concerned, to any system, although in contravention to the common-law rule, which permitted the appropriation of those waters for legitimate industries." U. S. v. Rio Grande Irr. Co., supra, 174 U. S. page 706, 19 S. Ct. 770, 776, 43 L. Ed. 1136, as above quoted. We can see no reason why there should be any distinction in principle between actual possession and diversion and the constructive possession of an owner of riparian land, recognized by the state in declaring by legislation and judicial decision that the running water therein or adjacent thereto is a part and parcel thereof. However, that matter, as will presently appear, is not properly before us, and we refrain from deciding whether the government has expressly or impliedly consented to such water rights as have been recognized by the state, where there has been no actual appropriation or use thereof other than that arising from the irrigation, and the fertilization therefrom in the course of nature. The question of title to the beds of streams in a state which depends upon the navigability thereof is an entirely different matter, and the relative rights of the state and the federal government are dependent upon the principle of uniformity in the various states, and for that reason and also because the rights of the federal government are involved, the matter is one for determination by the federal courts which are not bound by the legislative or judicial determination of the state as to the fact of navigability. The late decisions of the Supreme Court on that subject, cited by the government (Kansas v. Colorado, 206 U. S. 46, 27 S. Ct. 655, 51 L. Ed. 956; United States v. Utah, 283 U. S. 64, 51 S. Ct. 438, 75 L. Ed. 844), have no very direct bearing upon the question of the effect of state legislation and decision as to water rights, not only because there is federal legislation, above referred to, expressly modifying the relative rights of the citizens of a state and of the government with reference to the rights of the government as owner of public lands to the use of water flowing therein, but also because there is no federal common law to fix the rights of the government in its capacity as proprietor thereof. Kansas v. Colorado, 206 U. S. 46, 96, 27 S. Ct. 655, 665, 51 L. Ed. 956. The decision of the Supreme Court in the controversy between Kansas and Colorado as to the waters of the Arkansas river (supra) deals with the relative rights of these states to the waters of the Arkansas river, and is an illuminating discussion of the legislative power of the government and of the state over the waters and lands within a state. A few excerpts from that opinion will perhaps sufficiently indicate the trend of the decision, although it is difficult to do so adequately without more extended quotation:

" * * * At the time of the adoption of the Constitution, within the known and conceded limits of the United States there were no large tracts of arid land, and nothing which called for any further action than that which might be taken by the legislature of the state in which any particular tract of such land was to be found; and the Constitution, therefore, makes no provision for a national control of the arid regions or their reclamation. But, as our national territory has been enlarged, we have within our borders extensive tracts of arid lands which ought to be reclaimed, and it may well be that no power is adequate for their reclamation other than that of the national government. But, if no such power has been granted, none can be exercised.

"It does not follow from this that the national government is entirely powerless in respect to this matter. These arid lands are largely within the territories, and over them, by virtue of the second paragraph of § 3 of article 4, heretofore quoted, or by virtue of the power vested in the national government

to acquire territory by treaties, congress has full power of legislation, subject to no restrictions other than those expressly named in the Constitution, and, therefore, it may legislate in respect to all arid lands within their limits. As to those lands within the limits of the states, at least of the Western states, the national government is the most considerable owner and has power to dispose of and make all needful rules and regulations respecting its property. We do not mean that its legislation can override state laws in respect to the general subject of reclamation. While arid lands are to be found mainly, if not only, in the Western and newer states, yet the powers of the national government within the limits of those states are the same (no greater and no less) than those within the limits of the original thirteen; and it would be strange if, in the absence of a definite grant of power, the national government could enter the territory of the states along the Atlantic and legislate in respect to improving, by irrigation or otherwise, the lands within their borders. Nor do we understand that hitherto Congress has acted in disregard to this limitation. As said by Mr. Justice White, delivering the opinion of the court in Gutierres v. Albuquerque Land Co., 188 U. S. 545, 554, 23 S. Ct. 338, 341, 47 L. Ed. 588, 593, after referring to previous legislation:

" 'It may be observed that the purport of the previous acts is reflexively illustrated by the Act of June 17, 1902, 32 Stat. 388. That act appropriated the receipts from the sale and disposal of the public lands in certain states and territories to the construction of irrigation works for the reclamation of arid lands. The 8th section of the act [43 USCA §§ 372, 383] is as follows:

" ' "Sec. 8. That nothing in this act shall be construed as affecting or intending to affect or to in any way interfere with the laws of any state or territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any state, or of the Federal government, or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof: Provided, That the right to the use of the water acquired under the provisions of this act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right." '

"But it is useless to pursue the inquiry further in this direction. It is enough for the purposes of this case that each state has full jurisdiction over the lands within its borders, including the beds of streams and other waters. Martin v. Waddell, 16 Pet. 367, 10 L. Ed. 997; Pollard v. Hagan, 3 How. 212, 11 L. Ed. 565; Goodtitle v. Kibbe, 9 How. 471, 13 L. Ed. 220; Barney v. Keokuk, 94 U. S. 324, 24 L. Ed. 224; St. Louis v. Myers, 113 U. S. 566, 5 S. Ct. 640, 28 L. Ed. 1131; Packer v. Bird, 137 U. S. 661, 11 S. Ct. 210, 34 L. Ed. 819; Hardin v. Jordan, 140 U. S. 371, 11 S. Ct. 808, 838, 35 L. Ed. 428; Kaukauna Water Pr. Co. v. Green Bay & Miss. Canal Co., 142 U. S. 254, 12 S. Ct. 173, 35 L. Ed. 1004; Shively v. Bowlby, 152 U. S. 1, 14 S. Ct. 548, 38 L. Ed. 331; Water Power Co. v. Water Comm., 168 U. S. 349, 18 S. Ct. 157, 42 L. Ed. 497; Kean v. Calumet Canal Co., 190 U. S. 452, 23 S. Ct. 651, 47 L. Ed. 1134. * * *

"It may determine for itself whether the common-law rule in respect to riparian rights or that doctrine which obtains in the arid regions of the West of the appropriation of waters for the purposes of irrigation shall control. Congress cannot enforce either rule upon any state. It is undoubtedly true that the early settlers brought to this country the common law of England, and that that common law throws light on the meaning and scope of the Constitution of the United States, and is also in many states expressly recognized as of controlling force in the absence of express statute. * * *

"In the argument on the demurrer counsel for plaintiff endeavored to show that Congress had expressly imposed the common law on all this territory prior to its formation into states. See also the opinion of the Supreme Court of Kansas in Clark v. Allaman, 71 Kan. 206 [80 P. 571, 70 L. R. A. 971]. But when the states of Kansas and Colorado were admitted into the Union they were admitted with the full powers of local sovereignty which belonged to other states (Pollard v. Hagan, supra; Shively v. Bowlby, supra; Hardin v. Shedd, 190 U. S. 508, 519, 23 S. Ct. 685, 47 L. Ed. 1156); and Colorado, by its legislation, has recognized the right of appropriating the flowing waters to the purposes of irrigation. Now the question arises between two states, one recognizing generally the common-law rule of riparian rights and the other prescribing the doctrine of the public ownership of flowing water.

Neither state can legislate for, or impose its own policy upon the other. A stream flows through the two and a controversy is presented as to the flow of that stream. * * *

"It has been said that there is no common law of the United States as distinguished from the common law of the several states. This contention was made in Western Union Teleg. Co. v. Call Pub. Co., 181 U. S. 92, 21 S. Ct. 561, 45 L. Ed. 765, in which it was asserted that, as Congress, having sole jurisdiction over interstate commerce, had prescribed no rates for interstate telegraphic communications, there was no limit on the power of a telegraph company in respect thereto. After referring to the general contention, we said (pages 101, 102 of 181 U. S., 21 S. Ct. 561):

" 'Properly understood, no exceptions can be taken to declarations of this kind. There is no body of Federal common law separate and distinct from the common law existing in the several states in the sense that there is a body of statute law enacted by Congress separate and distinct from the body of statute law enacted by the several states. But it is an entirely different thing to hold that there is no common law in force generally throughout the United States, and that the countless multitude of interstate commercial transactions are subject to no rules and burdened by no restrictions other than those expressed in the statutes of Congress. * * * Can it be that the great multitude of interstate commercial transactions are freed from the burdens created by the common law, as so defined, and are subject to no rule except that to be found in the statutes of Congress? We are clearly of opinion that this cannot be so, and that the principles of the common law are operative upon all interstate commercial transactions, except so far as they are modified by congressional enactment.'

"What is the common law? Kent says (vol. 1, p. 471):

" 'The common law includes those principles, usages, and rules of action applicable to the government and security of persons and property, which do not rest for their authority upon any express and positive declaration of the will of the legislature.'

"As it does not rest on any statute or other written declaration of the sovereign, there must, as to each principle thereof, be a first statement. Those statements are found in the decisions of courts, and the first statement presents the principle as certainly as the last. Multiplication of declarations merely adds

certainty. For after all, the common law is but the accumulated expressions of the various judicial tribunals in their efforts to ascertain what is right and just between individuals in respect to private disputes."

In view of the long acquiescence of the federal government in the use of waters arising on or flowing through public lands it would seem that special legislation was to be reasonably expected as a basis for the litigation of its rights thereto. Without again citing specific statutes or decisions, a general view of the decisions, and of the federal legislation, leads to the conclusion that it has been the consistent policy of the government of the United States to allow the citizens of the various states to work out their own system of law with relation to water rights without intervention or adverse legislation by the federal government. Not only has this been the policy of the government, but appellees contend it is settled law that the government of the United States in its proprietary relationship growing out of the ownership of public lands is subordinate to and controlled by state legislation and decision upon that subject. No authority to the contrary is cited by the government, if we except the dictum above quoted from the opinion by Justice Brewer in U. S. v. Rio Grande Irr. Co., supra, 174 U. S. page 703, 19 S. Ct. 770, 43 L. Ed. 1136, to the effect that in the absence of specific authority from Congress a state cannot by its legislation destroy the right of the United States as the owner of lands bordering on a stream to the continued flow of its waters, so far at least as may be necessary for the beneficial uses of the government property.

Appellee Central Stockholders Corporation of Vallejo contends that the questions raised by the government as hereinbefore stated, and many others involved in the decision of the District Court, are not properly before the court for consideration, that the right of the government to control navigable streams is not involved, that the proprietary right of the government in and to the waters flowing in and across the public domain is not involved, and that the sole question presented by the record is as to the obligation of the permittee, or licensee, to make compensation to private owners whose rights, as recognized by the state, are interfered with by the permittee in the carrying out of the project covered by the permit. In short, the appellee Central Stockholders Corporation of Vallejo contends that the effect of the permit from the Federal Water Power Act (16

USCA §§ 791–823) is merely to allow the permittee to occupy public lands of the United States by its dams and reservoirs, and that as against private owners of waters affected by the project the permittee is required to compensate all owners of water rights affected by the work done and the use of water contemplated by the licensee or permittee.

Having thus stated in very general terms the contention of the parties, we will state more in detail the situation presented by the record and will then return to a consideration of the legal questions involved in the appeal.

The appellee Southern California Edison Company was granted a permit by the Federal Water Power Commission for the construction of power plants and dams on and across lands riparian to some of the streams tributary to the San Joaquin river. The Central Stockholders' Corporation of Vallejo, owning lands riparian to the San Joaquin river where said river is declared by the statutes of California to be navigable, brought an action in the superior court of Stanislaus county to enjoin the permittee from interfering with its riparian rights in and to the waters of said river as declared and determined by the Supreme Court of California in the Herminghaus Case. The permittee, Southern California Edison Company, appellee, filed a cross-complaint in that action for the condemnation of the rights thus asserted by the Central Stockholders' Corporation of Vallejo. It is conceded by the government that if this case proceeds to judgment it would result in a verdict for damages due to the condemnation of such rights. The government, powerless to intervene in the pending action in the state court, claims in its complaint herein, that any judgment so rendered in the condemnation proceedings, although first paid by the permittee, will subsequently fall upon the government at the expiration of the permit, for the reason that at that time the federal government is authorized to take over the project of the permittee upon payment of a reasonable value thereof which will probably include expenditures made by the permittee in the acquisition of the alleged rights of the Central Stockholders' Corporation of Vallejo. The government, therefore, seeks to enjoin the further prosecution of this case in the state court. The right to an injunction is thus based upon the proprietary rights of the government in and to its public lands, and waters. The government's contention is predicated upon the theory that, although the permittee now would be required to pay the amount determined in the state court to be the value of the rights of the Central Stockholders' Corporation taken over by the permittee, the permittee is in effect an agent of the federal government to carry out its project and as such is vested with the right of the government not only in and to the lands occupied by its dam and reservoir site, but also in and to the waters thus impounded, and that the rights of the government in and to such waters include the very right being exercised by the permittee, that is, the right to impound the water for the generation of hydroelectric power to be held whenever and until such water is reasonably necessary for the generation of such power, and thereafter to release such water into the stream. The question as to whether or not the permittee is thus vested with the alleged right of the government to impound water as against a lower riparian owner is a comparatively simple one and must be determined from a consideration of the Federal Water Power Act which, as we have noted, expressly reserves to private owners of water their rights as fixed by the state law. If the action, however, can be regarded not only as one to enjoin further prosecution of litigation in the state courts upon the theory indicated, but also one brought by the government of the United States to quiet its title, that is, to define its right to waters rising upon or flowing through the public lands of the United States, the problem involved is more complicated and fundamental.

We will first consider the question as to whether or not the Southern California Edison Company is required by the Federal Water Power Act (41 Stat. 1063 [16 USCA c. 12, §§ 791–823) to pay for damages resulting from impounding the water of the stream in violation of the rights of riparian owners as defined by the state law, and will first determine whether or not an injunction against the further prosecution of this suit involving the rights of such private owners is proper, and will then consider whether or not the action at bar is an action to quiet title to the waters of the United States appurtenant to or a parcel of its public lands, and if so what those rights may be.

With reference to the effect of the Federal Water Power Act we are not without authority for our guidance as to the proper interpretation of that law. In Ford & Son v. Little Falls Co., 280 U. S. 369, 50 S. Ct. 140, 74 L. Ed. 483, a private business corporation, licensed by the Federal Water Power Commission to use, for development of elec-

tric power, the surplus water from a dam in the Hudson river, constructed under acts of Congress, placed flashboards on the crest of the dam, as the license permitted but did not require it to do, and thus raised the level of the water pool to such an extent as to diminish the head and impair the value of a dam and water power belonging to riparian proprietors above on the Mohawk river, a navigable tributary of the Hudson. It was contended by the permittee that the permit to erect the lower dam was in furtherance of navigation, that the federal government had plenary power over that subject, and that, having by the permit authorized the construction of the dam in question, the dam in legal effect was constructed by the federal government in aid of navigation. The Supreme Court in that case said, at page 378 of 280 U. S., 50 S. Ct. 140, 141:

"Section 10 (c) (16 USCA § 803 (c)) provides that licensees 'shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation' of the licensed project, and by section 27 (16 USCA § 821) it is provided: 'Nothing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, * * * or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein.' By section 21 (16 USCA § 814), licensees are given the power of eminent domain and authorized to conduct condemnation proceedings in district or state courts for the acquisition 'or the right to use or damage the lands or property of others necessary to the construction, maintenance, or operation of any dam * * * [or] * * * diversion structure * * *' in connection with an authorized project which they are unable to acquire by contract. By section 6 (16 USCA § 799), all licenses are required to be 'conditioned upon acceptance by the licensee of all the terms and conditions of this Act.'

"While these sections are consistent with the recognition that state laws affecting the distribution or use of water in navigable waters and the rights derived from those laws may be subordinate to the power of the national government to regulate commerce upon them, they nevertheless so restrict the operation of the entire act that the powers conferred by it on the Commission do not extend to the impairment of the operation of those laws or to the extinguishment of rights acquired under them without remuneration. We think the interest here asserted by the respondents, so far as the laws of the state are concerned, is a vested right acquired under those laws, and so is one expressly saved by section 27 from destruction or appropriation by licensees without compensation, and that it is one which petitioner, by acceptance of the license under the provisions of section 6, must be deemed to have agreed to recognize and protect."

The Supreme Court found it unnecessary to determine whether or not the dam thus situated, erected by the federal government in aid of navigation, in furtherance of its sovereign power over navigable water courses, would leave the owner of the upper power plant without recourse for the injuries suffered, because of the fact that the Federal Water Power Act expressly required its permittees to make compensation for private rights. The section of the act, section 10(c), 16 USCA § 803(c), with relation to such private rights is as follows:

"(c) That the licensee shall maintain the project works in a condition of repair adequate for the purposes of navigation and for the efficient operation of said works in the development and transmission of power, shall make all necessary renewals and replacements, shall establish and maintain adequate depreciation reserves for such purposes, shall so maintain and operate said works as not to impair navigation, and shall conform to such rules and regulations as the commission may from time to time prescribe for the protection of life, health, and property. Each licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto, constructed under the license, and in no event shall the United States be liable therefor."

The analogy of the Ford Case to the present one is too obvious to require extended discussion. That case involved, as does this, interference by a permittee with a private right recognized by state law, in relation to the waters of a stream across which a dam had been constructed. In that case the permittee was required to compensate the owner for the damage caused by the addition by the permittee of flashboards on the crest of a federal dam and in this case, where the dam has been constructed entirely by the permittee the same result would follow. Indeed, appellant admits that under the Ford Case

its permittee would be required to pay the damage fixed by the state court in condemnation proceedings, and bases its prayer for injunction against the further prosecution of the case pending in the state court upon the ground that the result of such an action will be to fix such damages. In the Ford Case, however, the government was not a party, and the question there determined was the relation of the permittee to other riparian owners on the stream. Here the government has instituted this action upon the theory that the result of the private litigation now pending would be to place upon the federal government the burden of paying the judgment at the expiration of the permit. Broadly stated, the contention of the government is that this case is distinguishable from the Ford Case for the reason that in the case at bar a question as to the rights of the government, through its permittee, to construct the contemplated dam and reservoir is here presented for the first time. This right of the government, it is contended, is based upon its sovereign power to regulate and control navigable waters (that being the purpose of the dam constructed by the government in the Ford Case), and also upon the proprietary right of the government in and to the waters impounded by the dam. These contentions involve a consideration of the purpose of Congress in the passage of the Federal Water Power Act. The Supreme Court held in the Ford Case, in effect, that it was not the intention of Congress to vest any portion of its sovereign power in the permittee, and, assuming that the government might have exercised its control over navigable streams by and through a permittee under the Federal Water Power Act, that it was not the intention of the government so to do. On the contrary, the general purpose of the act was to permit what would otherwise be an infringement of the rights of the federal government and an interference with navigation, that is, to permit a purpresture, requiring the permittee, however, to make due compensation where the project involved the taking of private property. To put it in another way, the law expressly recognizes all private rights established and determined by the law of the state and expressly requires the permittee, where it interferes with such rights to compensate the owners therefor. If we assume, as is contended, that the government in this case might, in the aid of navigation of the San Joaquin river, impound the waters of the tributary streams and feed them into the river in a manner best suited to navigation without regard to the rights of other riparian owners to the waters of the stream for purposes of irrigation, etc., and without compensation therefor, such assumption cannot avail the government because the Ford Case holds that in the exercise of such powers through a permittee under the Federal Water Power Act such permittee must make compensation for private rights so taken. It seems absurd to say that although Congress has expressly required its permittee to compensate for damages due to its interference with private rights, the fact that the government is required by its lease to reimburse the permittee at the expiration of the permit, authorizes the government to prevent the ascertainment and payment by the permittee of the damages Congress has required it to pay.

We conclude, therefore, that in so far as the permittee is acting by or for the government, any right conferred upon the permittee so to do is by act of Congress subordinated to the right of private owners interfered with or affected by the authorized project, and that in so far as the project of the permittee is in aid of navigation it is not clothed with any of the sovereign rights of the United States to control the navigation of the stream which may be in conflict with the riparian rights of the property owners to recover damages for losses of property due to such dam. While the question of the right of the permittee to exercise the riparian rights of the government due to its ownership of public land by impounding the waters of a stream rising on and flowing through government land is not expressly determined in the Ford Case, that case definitely determines that the permittee is by express provision of the Federal Water Power Act required to pay all damages inflicted by it upon private property rights. This conclusion is wholly inconsistent with the proposition that it was the intention of Congress that the permittee should be able to set off the rights of the government, whatever they might be, as against the rights of other owners of the water. In short, it is obviously not the intention of Congress to vest in the permittee any of its rights in and to the waters of the stream which are inconsistent with the rights of other owners, except in so far as the authority of the federal government to carry out the project authorizes the taking of private property with just compensation to private owners. We may, therefore, dismiss the contentions of the government based upon a

right to enjoin the further prosecution of the suits in the state court. The decision of the trial court upon that subject was correct.

The case was decided in the trial court upon a motion to dismiss the complaint so that the facts stated in the complaint were admitted in the trial court and for the purpose of the appeal must be assumed to be correct. See however, as to judicial notice, Arizona v. California, 283 U. S. 423, 452, 51 S. Ct. 522, 75 L. Ed. 1154; Jackson v. U. S., 230 U. S. 2, 33 S. Ct. 1011, 57 L. Ed. 1363; U. S. v. Utah, 283 U. S. 64, 51 S. Ct. 438, 75 L. Ed. 844, supra. Assuming, as we have decided, that the action must fail in so far as it is predicated upon a right to enjoin the state court from proceeding in the pending action, it remains to consider whether or not there are sufficient allegations in the complaint to require a consideration of the fundamental rights of the government in and to the waters of the San Joaquin river by reason of its ownership of public lands or its power over navigable waters to require a determination of those rights.

The right to control navigable waters may be readily dismissed from consideration so far as a suit to quiet title is concerned because it is not a right of property but of sovereign power vested in the federal government and not to be determined in such a suit. Such political rights are not a subject of litigation. New Jersey v. Sargent, 269 U. S. 328, 46 S. Ct. 122, 70 L. Ed. 289. A judgment affecting such rights would be at best a declaratory judgment which is not permitted in federal procedure. New Jersey v. Sargent, supra; Texas v. Interstate Commerce Comm., 258 U. S. 158, 42 S. Ct. 261, 66 L. Ed. 531; Liberty Warehouse v. Grannis, 273 U. S. 70, 47 S. Ct. 282, 71 L. Ed. 541; Willing v. Chicago Auditorium, 277 U. S. 274, 289, 48 S. Ct. 507, 72 L. Ed. 880.

We will now consider the proposition advanced by the government that this action is one to quiet title to its water rights considered as a part and parcel of the public domain.

The bill of complaint of the plaintiff occupies 39 pages of the transcript, and in dealing with the question now under consideration we will summarize as far as possible to do so, and for that reason will not quote at length from the bill.

It is alleged that the government owns certain large bodies of land known as the Sierra National Forest in the counties of Fresno and Madera in the state of California; and more particularly owns lands in townships 6, 7, 8, 9, and 10 South, ranges 24, 25, 26, 27, 28, Mt. Diablo Base Meridian, shown on map attached to the complaint; that these lands contain forests of great extent; that said lands have been set apart by Acts of Congress (26 Stat. 650 [16 USCA §§ 44, 45, 55, 61]; 33 Stat. 702 [16 USCA §§ 46, 49]; 34 Stat. 831 [16 USCA §§ 47–50]; 27 Stat. 1059; 26 Stat. 1103 [16 USCA § 471]; 30 Stat. 34 [16 USCA § 475]) to secure favorable conditions of the water flow, and for other purposes. It is alleged that:

"Many streams of water have their sources in springs and melting snows upon said lands and flow through and across the said lands and are tributary to the San Joaquin River. Said streams, until they reach the said river, and the said river, until it reaches Herndon, are innavigable."

That plaintiff has expended large sums of money for the improvement of the San Joaquin river, and the maintenance of a navigable channel therein.

"6. Said lands of the plaintiff are high and mountainous and are subject at certain seasons to deep falls of snow and to heavy rain storms. By reason of the mountainous character of said lands and the sudden changes of temperature which characterize the climate of that part of the state of California, the rains and melting snows often cause great and disastrous floods to pass down the said streams. As such flood waters collect in the tributaries and join in great volume in the San Joaquin River, they carry great quantities of silt, depositing the same in the navigable channels, changing the courses thereof, greatly damaging and impeding the navigation of said river, and causing great expense to plaintiff in the protection and improvement of navigation. The largest part of the precipitation upon the areas contributing to the flow of the said San Joaquin River falls in the winter and spring months and passes quickly down the streams, flooding and damaging adjacent lands, interfering with navigation of its proper channels, and finally wasting into the ocean. The rainfall in the summer and autumn is ordinarily inadequate on the said areas to maintain the flow of said stream during these seasons and the beneficial uses of the waters thereof are limited by this fact. If the flood waters of said river may be impounded in reservoirs and the flow equalized from season to season, useful navigation could be carried on in all of the navigable parts of the said stream; and the flood

waters thereof, now wasting into the sea, could be made to serve many additional beneficial uses on the lands of the plaintiff and others."

It is also alleged that there are many suitable reservoir sites upon the government lands, and that by the construction and operation of suitable works thereon "the floods of said river can and will be largely controlled and prevented and the silting and shifting of the navigable channels thereof will be diminished. By the construction and regulation of such storage reservoirs the excess waters in times of flood can and will be held back to be released in times of low water, thereby saving waters otherwise wasted, removing silt from the waters, stabilizing the navigable channels of said river, increasing the depth of water during low-water seasons, and greatly extending and improving the navigability thereof."

It is further alleged that there are many suitable sites for the development of hydroelectric power which can be transmitted to the cities and communities in the state of California at a profitable price, that the government derives revenue from such hydro-electric plants under the Water Power Act.

"The economic development of power on said lands of the plaintiff is dependent upon the regulation of the stream flow by means of reservoirs whereby the flood waters may be retained to be used in times of scarcity."

It is alleged that the government has from time to time executed and delivered to the Southern California Edison Company permits for reservoir sites and power plants; one reservoir known as Huntington Lake having approximate capacity of 88,834 acre feet; that this plant is already paying a revenue to the government of over $26,000 per annum, and that the revenue can be increased by additions to the plant; that it issued a permit to the same corporation for an hydroelectric power plant which will develop 175,-600 horse power; that the government will receive about $30,000 per year from revenues derived by the company on such operation; that a license for another project having a capacity of 55,000 horse power has been issued; that the government will receive license fees of about $19,000 per annum from this project; that the total amount of storage provided by the permits issued to the Southern California Edison Company amounts to 434,470 acre feet, and the total power developed or to be developed amounts to 852,500 horse power. It is alleged that the

authorities of the state of California are cooperating with the government for the regulation and control of the flood waters of the San Joaquin river and the Sacramento river and conserving waters of said streams for beneficial uses (27 Stat. 507 [33 USCA § 661 et seq.]; 39 Stat. 949, § 2 [33 USCA § 703]; 26 Stat. 1095; 36 Stat. 847; 41 Stat. 1063; Stats. of Calif. 1911 [Ex. Sess.] p. 117; Stats. of Calif. 1925, c. 176, p. 325; Stats. of Calif. 1886 [Ex. Sess.] p. vi; Stats. of Calif. 1891, p. 520; Stats. of Calif. 1927, pp. 2376, 2400).

That: "In furtherance of a comprehensive scheme of development of said streams the State Department of Public Works of California has proposed to the Legislature of said state a plan set forth in Bulletins No. 9 and 12 of the said Department of Public Works for storing all the flood waters thereof in reservoirs to be constructed for power purposes on the headwaters and tributaries and in reservoirs to be constructed for irrigation, navigation and flood control purposes on suitable sites where said streams and tributaries emerge from the foothills, and elsewhere on said rivers. By act of the Legislature of said state of April 29, 1927, the administrative authorities of said state were directed to withdraw from private appropriation all the waters of said streams not theretofore used in order to make the same available in development of said coordinated comprehensive plan."

In pursuance of said comprehensive plan of the state and federal authorities, it is alleged that the state authorities have filed appropriation notices upon the flood waters of said rivers, that the federal government has withdrawn from private entry certain reservoir sites and particularly reservoir sites on the lands of the plaintiff on the San Joaquin river known as the Friant Reservoir site.

"Plaintiff anticipates and alleges that in due course some duly authorized agency of said state will be given authority from plaintiff to construct and operate said Friant reservoir. Plaintiff alleges that the construction and operation of said reservoir and of the reservoirs permitted and licensed to its said licensee, Southern California Edison Company, for flood control, irrigation, and power purposes are consistent with and constitute a part of the most comprehensive scheme of development of said San Joaquin River for navigation and other purposes and of the water resources of said region as considered and adopted by the Federal Power Commission and by the Legislature of said

state, and are desirable and justified in the public interest for the purpose of protecting, improving and developing the said San Joaquin River for the use and benefit of interstate and foreign commerce."

It is alleged that:

"If the construction and operation of the reservoirs referred to in paragraph 10 hereof shall be prevented, plaintiff will be deprived of its right to an increase of revenues from said project 96 and will be deprived of its right to have its licensees contribute and cooperate in the construction of headwater improvements as in section 10 (f) of the Federal Water Power Act [16 USCA § 803 (f)] provided."

"15. The defendant, Central Stockholders Corporation of Vallejo, claims to be the owner of certain lands in the county of Stanislaus in said state of California, alleging the same to be riparian to the San Joaquin River, and claims certain rights in the flow of the waters of said river adverse to the right of plaintiff and its licensees therein as herein set out; and has demanded large sums of money from the said defendants Southern California Edison Company, as damages to said lands by reason of the operation of said projects. Plaintiff alleges that the claim of the defendant Central Stockholders Corporation of Vallejo to the waters of said river is without right, and that the rights, if any, possessed by the said defendant, Central Stockholders Corporation of Vallejo, are inferior and subordinate to the right of plaintiff and its licensee, Southern California Edison Company, as herein set out, to reservoir, store and use said waters for the production of power and to regulate the flow of said stream for the protection and improvement of navigation. * * *

"16. Plaintiff alleges that by reason of its ownership of the said lands in Exhibit 'A' hereof described, by reason of the navigable character of the said San Joaquin River where the same borders upon the lands of the defendant Central Stockholders Corporation of Vallejo, and by reason of plaintiff's sovereign authority to protect and improve the said river for the uses of interstate and foreign commerce, the rights of plaintiff in the control and use of said waters is superior to all rights of the defendants herein. * * * *"

"20. Plaintiff alleges that the San Joaquin River at all points opposite the lands claimed by the defendant, Central Stockholders Corporation of Vallejo, is a navigable stream, and that the use made by said de-fendant, Central Stockholders Corporation of Vallejo, of the waters of said river as claimed in the action referred to in paragraph 16 hereof, is not a use in connection with navigation and is not a reasonable use as against the plaintiff herein, but is excessive, wasteful, beyond the use authorized by the Constitution and the statutes of the state of California, or otherwise, as a riparian use and in excess of any use which said defendant as appropriator or riparian owner can rightfully claim as against the riparian and appropriative rights of the plaintiff and its licensees to enjoy a reasonable participation in the benefits of said stream pursuant to the statutes of the state of California and of the United States. There exists in said river a large surplus of water, unappropriated and unused, more than is reasonably needed by said defendant, Central Stockholders Corporation of Vallejo, on its riparian lands and more than said defendant has actually used for more than ten years last past, and the same is lawfully available for storage by the plaintiff and its said licensee, Southern California Edison Company, for the uses to which the plaintiff, as herein set out, plans to put said waters.

"21. The use of the waters of said river by the plaintiff and its licensees by storing, regulating and employing the same on their riparian lands in the production of power is a reasonable and lawful use, is advantageous to the plaintiff, and does not deprive the said defendant, Central Stockholders Corporation of Vallejo, of any waters reasonably used or reasonably needed for use on riparian lands of said defendant."

Appellant then alleges that all the land of the defendant Central Stockholders' Corporation of Vallejo riparian to the San Joaquin river "consists of tracts of land granted to the State of California by plaintiff under the provisions of the said Swamp-land Act, and that said tracts consist of 'uncultivated areas of land not devoted to cultivated crops.' The precise legal designations of said swamp and overflow tracts, as patented by said state, are not known to plaintiff and cannot therefore be more particularly set out herein."

It was alleged on August 10, 1913, that the Legislature of the state caused said tracts of overflowed land to be included in the Sacramento and San Joaquin reclamation district and empowered the directors of such district to reclaim from overflow all lands so included and to lay taxes on all the lands situated therein for the purpose of constructing levees, drains, and other works necessary or

useful for the reclamation of such lands from overflow; that by reason of said act the defendant Central Stockholders' Corporation of Vallejo had no right to have its land designated in Exhibit C of the complaint overflowed by the waters of said San Joaquin river.

It is then alleged that the Legislature of California enacted a statute declaring that no person, whether for riparian use or otherwise, may lawfully claim from the streams in the state the right to use in any one year more than 2½ acre feet of water per acre in the irrigation of uncultivated areas of land not devoted to cultivated crops. Stats. Calif. 1913, p. 1012; section 2, art. 17, Const. Cal.

It is alleged that if the waters may be impounded by dams, as contemplated by the state and the government, that "the said lands will be reclaimed from floods and it will be unnecessary to construct drains and levees as provided in the Swamp Land Act."

It is further alleged that representatives of the state of California in order to secure patents to public lands as swamp and overflowed lands represented that the lands of the Central Stockholders' Corporation of Vallejo were swamp and overflowed lands; that in reliance upon such representations these lands were found to be of that character, and that in pursuance of such finding the state accepted title thereto under the provisions and conditions of the Swamp Land Act (43 USCA § 982 et seq.) ; that these lands had been conveyed by the state, and by mesne conveyance have vested in the Central Stockholders' Corporation of Vallejo, and that therefore that corporation is estopped to claim that said tracts of land are arid lands "or that said tracts need to be overflowed by the waters of said San Joaquin River or otherwise in order to be made productive." It is alleged that the grant of said lands to the state was obtained and is held upon condition in favor of the government that said lands should be reclaimed from overflow, and that the state of California is estopped to make any rule of law, "whether by acts of its legislature or by decisions of its courts whereby it should be held that the owner or claimant of said tracts has the right as against the plaintiff or licensees of plaintiff to have said tracts overflowed by the waters of the San Joaquin River or otherwise. The claim of right to have said tracts of land overflowed is in violation of the contractual rights of the plaintiff as herein set out; is unjust and inequitable as against the plaintiff; impairs and destroys the right of plaintiff to utilize and dispose of its remaining lands for the development of power and for the improvement of the said river for the uses of navigation."

It is alleged that the Southern California Edison Company has expended more than $107,500,000 in the construction of projects authorized by the government, and that: "The utility of said project works is dependent in a large measure upon the right of said licensee to store the waters of said San Joaquin River therein and if it should be held that said licensee is without such right it will be impossible to operate said projects at their full capacity; the advantages accruing to plaintiff, as herein set out, from such expenditures in the development of said lands of plaintiff and in improvement of navigation will be largely lost."

It is alleged: "The acts and claims of the said defendant, Central Stockholders Corporation of Vallejo, if permitted and allowed, constitute an injury to the value of said lands and to the reversionary right of plaintiff in said lands, and constitute an impediment and obstruction to the constitutional authority of plaintiff to control said river for which plaintiff is without any adequate remedy at law."

It is alleged: "The said claim of the said defendant, Central Stockholders Corporation of Vallejo, as asserted in said State Court and as herein referred to, constitutes a cloud upon the title of the United States in its said lands, shown on Exhibit 'A' hereof, and upon its right to use of the waters flowing therein and causes, so long as it is maintained, a great pecuniary loss to plaintiff, in that it prevents the licensees of plaintiff from constructing and operating power plants on said lands, reduces the rentals therefrom, and interferes with plaintiff in the use and primary disposal of said lands."

It is also alleged that the assertion of said claim by the Central Stockholders' Corporation of Vallejo hinders and prevents individuals and corporations from making application to the plaintiff for, and from constructing, reservoir and power projects upon the lands of the plaintiff and upon the headwaters of the navigable waters of the San Joaquin river. It is alleged that: "Plaintiff is the owner of many large areas of lands on the headwaters of other streams in the state of California, having great value for storage of water, for production of power, for improvement of navigation and for protection from floods."

It is then alleged that it is the purpose of the government to authorize the further storage of water, and that if the actions then pending in the state courts are prosecuted to a successful conclusion other persons owning swamp and overflow lands on the San Joaquin river and other rivers will file similar suits, and that thereby the rights of the government will be impaired and a multiplicity of suits will result; that the government has no adequate remedy at law; that the rights of the government in the protection and improvement of navigation are superior to all rights of the defendant Central Stockholders' Corporation of Vallejo in said stream; that the claims of said defendant "to have its lands flooded and to have the said river flow by its said lands without being regulated and the acts of said defendant in asserting said claim constitutes an interference with the right of plaintiff to have said plan carried out for development of plaintiff's lands, for improvement of navigation, for control of floods and for conservation of the water resources of plaintiff's lands."

The prayer of the government's bill of complaint asks that the Central Stockholders' Corporation of Vallejo be required to fully set up their claims to the waters of the San Joaquin river and its tributaries, that an injunction be issued against further prosecution of the suits then pending in the state court, that the Central Stockholders' Corporation of Vallejo be required to show the court the description of its lands, the sources of its title, and the manner in which the subdivision of its lands are claimed to be riparian to the San Joaquin river, and "* * * that a decree be entered herein adjudging and decreeing that the said defendant, Central Stockholders Corporation of Vallejo, has no right as against this plaintiff and its licensees to the flooding of its said lands and no right to prevent the construction by the said defendant, Southern California Edison Company, of the reservoirs hereinbefore described, and no right to prevent the storage of water therein for the purposes for which they were licensed. * * * That the plaintiff, subject to the rights granted by plaintiff to its licensees as herein set out, is the owner of the right to use on its riparian lands the waters of said San Joaquin River and the tributaries flowing upon, over and across said lands of plaintiff for production of hydro-electric power and of the right as an incident to said use to reservoir the said waters and regulate the flow of said river; that the plaintiff as an incident of its

sovereign authority over the navigation of said river has the right to reservoir the waters and regulate the flow thereof superior to any right and claim of said defendant, Central Stockholders Corporation of Vallejo, and to so reservoir the said waters of said streams and to regulate the flow thereof in the manner in which plaintiff has done and is doing same by its contracts with its licensees and particularly by its contracts with its said licensee, Southern California Edison Company providing for the construction of the reservoirs herein specified on said stream and its tributaries and for the protection and improvement of navigation resulting from such construction; that the right and title of plaintiff to the use of said waters by reservoiring the same and regulating the flow thereof be forever quieted against said defendant, Central Stockholders Corporation of Vallejo," and that said corporation be enjoined from interfering with such use of such waters.

To understand the purport of these allegations and of this prayer, we must have recourse to the briefs and argument of counsel. It appears therefrom that this litigation is the result of the holding of the Supreme Court of the State of California in the Herminghaus Case, hereinbefore referred to, in which it was held that the owner of riparian land subject to annual overflow by the waters of the San Joaquin river, was entitled to have his lands so overflowed because of the benefit derived therefrom in the irrigation of said lands and in the fertilization thereof by the silt and other fertilizing values contained in the water of the stream, that this right was not only appurtenant to the riparian lands upon the stream itself, but also appertained to lands situated upon sloughs where said sloughs received water from the river at the time of high water. In other words, that the owners of lands riparian to sloughs which were only filled with water flowing therein at the times of flood water in the main stream were entitled to have such natural situation remain without such an interference with such flood as results from impounding the flood waters where, by reason of such regulation of the flow of the stream the crest of the high water would be insufficient, to permit of overflow into the aforesaid sloughs. This right to the undiminished flow of the usual annual flood waters of the stream would of course be entirely inconsistent with the impounding of such waters and the regulation of stream flow thereby, for even if the total amount of water which

flowed in the bed of the stream during the entire year was exactly the same after the flow was regulated as before, the owner of lands which were only reached by the waters of the stream at time of flood would be deprived of such water by the very process of securing more uniform flow of the stream. In this connection two matters should be observed, first, that the Supreme Court of California in the Herminghaus Case and in the Seneca Consolidated Case (Seneca Cons. Gold Mines Co. v. Great Western Power Co., 209 Cal. 206, 287 P. 93, 70 A. L. R. 210) was not dealing with the rights to excessive flood waters, but was dealing with the usual high water to be reasonably expected from the average annual rainfall and precipitation of snow and the melting of the snow in the mountains in the early spring and summer. In other words, it is dealing with the usual and not the unusual flow of the stream. The annual high water due to the melting snow in the high Sierra is a usual and annual occurrence.

The right of the state or of the government to deal with excessive flood waters by impounding the same is not questioned by the Supreme Court of California in the Herminghaus Case and is not involved we believe in the present case. We have then, on the one hand, the government claiming the right to impound the waters of all the tributaries of the San Joaquin river and to release the same at its pleasure and convenience, and on the other hand, the claims of·the lower riparian owners on these streams predicated upon the decisions of the Supreme Court of the State of California to have the waters flow in their usual and natural condition to and over and across other lands. The allegation of the bill of complaint that the use of water claimed by the defendant, Central Stockholders' Corporation of Vallejo is unreasonable, wasteful, and unnecessary, and that there is ample water in the stream and more than is required for the reasonable and necessary uses of said corporation, must be read in light of the law of California which prohibits any riparian owner or proprietor from an unreasonable use of water and in the light of the fact that the excessive flow of water in the streams is for but a short period. The effect of the allegation, then, is that if the flow of the stream is properly regulated there will be ample water for irrigation for all riparian owners and proprietors including the Central Stockholders' Corporation of Vallejo. Thus, far from alleging that, if the reservoirs are constructed and operated as appellant intends, the Central Stockholders' Corporation of Vallejo will be protected in its right to the usual and ordinary flow of the stream and to the beneficial effects thereof, we think that the allegation properly construed in the light of the statutes, reports, and decisions, of which the court takes judicial notice, is merely the assertion of a right to impound the water by dam as proposed, without regard to the riparian rights of lower lands as determined by the courts of the state of California. As we have said, the claims of the government based upon its sovereign power may be dismissed from consideration for the reason that such rights are not subject to equitable cognizance, and that a decision thereon would be in the nature of a declaratory judgment. It is not a function of a court of equity to declare what the sovereign rights of the government may be and fix the bounds thereof for the future. Those rights can only be determined when they affect the rights of the parties in an actual situation growing out of existing conditions, so that, so far as this action may be regarded as one to quiet the title of the government to its sovereign rights, it cannot be maintained. (See cases cited on this point, supra.)

As to the proprietary rights of the government, appellee Central Stockholders Corporation of Vallejo contends that the only right of the government is the right recognized by state law, and that the law of the state does not permit the impounding of the flood waters of a stream· by an upper riparian owner where it would result in taking from lower riparian owners all their rights. So that under the state law, as it is conceded, these contemplated projects cannot proceed without compensation to lower riparian owners for an interference with their rights. The government's claim, as stated, is that it has a common-law right to impound the waters of a stream for purposes of developing hydroelectric power. This contention involves the claim that public lands of the government have a riparian right as defined by common law, regardless of whether or not the common law has been adopted as the law of the state. We find no basis for such a claim in the decisions cited by the government, nor has our research developed any such decisions, but we do not pass on this question. It also involves the claim that such common-law right permits a riparian owner to detain the water in a stream for months or years, before it leaves his property. No case has been cited to this

effect. It is inconsistent with the common law as stated in the above quoted decisions of the Supreme Court, but we do not pass upon that question, for while we are inclined to agree with the position of appellees, we pause to determine whether or not the allegations of the complaint are sufficient to justify a decree quieting the title of the government to the waters appurtenant to its public lands. In this connection it is to be observed that the government occupies a dominating position on the stream. It can at all times assert whatever right it has by the physical act of impounding the water and utilizing it as it is contemplated. The mere claim of an owner of riparian lands below on the stream that the action of the government is inconsistent with his right, is not such an adverse claim as can be made the foundation for a suit to quiet title. A lower riparian owner or an appropriator is in quite a different position. Where an upper appropriator or riparian owner asserts a title inconsistent with the claims of the lower riparian owner or appropriator, and threatens immediately to divert water from the stream which would otherwise flow from the head waters over to lower appropriator or to the riparian land, such a threat coupled with the dominant physical situation of the upper riparian owner on the stream is obviously a sufficient basis for suit by the lower appropriator or owner to prevent such diversion, but a mere effort of a lower riparian owner to invoke a decision of a court as to his rights against a licensee of the upper riparian owner, unaccompanied by any threat of hostile physical interference with the works constructed or contemplated, does not require or justify the interference of the court to quiet the licensee's title to the waters. Indeed, in an important case just decided, the Supreme Court held the action by the state of Arizona against the proposed construction of the Hoover Dam to be premature, although the dam was above the proposed point of diversion of water in Arizona. Arizona v. California et al., 283 U. S. 423, 51 S. Ct. 522, 75 L. Ed. 703.

Our attention has been called to no case in which an upper riparian owner has maintained an action to quiet title as against a lower riparian owner or appropriator, nor have we found such a case. Under the decisions of the state of California a lower riparian owner, or appropriator, gains no title to the water by prescription or use as against an upper riparian owner or appropriator, for the reason that the use of the water after it leaves the lands of the riparian owner is in no sense an interference with the rights of an upper riparian owner which are fully satisfied at the time the water reaches his lower boundary line. What the rule may be under the ten-year clause in the Water Commission Act of California we need not determine (Stat. of Calif. 1913, p. 1012).

We hold, then, that the right of the federal government to regulate the flow of the San Joaquin river in the interest of navigation is not involved in this case; that it is the duty of the permittee of the government to award just compensation to private owners of water upon the San Joaquin river where their rights are interfered with by the proposed dam; that the federal government cannot maintain an action to quiet title to its riparian rights in the public domain as against lower owners of the stream and claimants of water flowing therein merely because under the laws of the state they may claim, and they do claim, rights inconsistent with the rights claimed by the federal government in and to the waters of such stream as a part and parcel of its public land. The courts cannot consider abstract questions. New York v. Illinois and Sanitary District of Chicago, 274 U. S. 488, 47 S. Ct. 661, 71 L. Ed. 1164; New Jersey v. Sargent, supra; Arizona v. California, supra. Inasmuch as we have discussed the proprietary rights of the United States in and to the waters flowing in or along its public lands in the state of California without deciding such rights, we deem it proper, to avoid the contention that its rights thereto are determined herein, to modify the judgment of the lower court by expressly providing that the dismissal of the action is without prejudice to the proprietary rights of the United States in and to its public lands and water rights appurtenant thereto.

As thus modified, the decree is affirmed.