[No. 27027. *En Banc.* January 7, 1939.]

Great Northern Railway Company, *Respondent,* v. Washington Electric Company et al., *Appellants.*[1]

[1]Reported in 86 P. (2d) 208.

628

*Todd, Holman & Sprague* and *Clarence Innis* (*Emory E. Hess, Lowell P. Mickelwait,* and *A. J. O'Connor,* of counsel), for appellants.

*Thomas Balmer, Edwin C. Matthias,* and *Anthony Kane,* for respondent.

ROBINSON, J.—This case is presented to the court for review through the medium of one thousand four hundred and fifty pages of testimony and one hundred and seventy-nine exhibits, many of them documentary. Fortunately, the questions of fact have been disposed of by jury verdict, but, as to the questions of law which we are required to pass upon, the parties have submitted more than seven hundred and fifty pages of printed briefs, containing more than four hundred citations to decided cases, supplemented by references to some eighty textbooks and statutes. This statement is not made for the purpose of stressing the magnitude of the work involved, but rather, as explanatory of the character of this opinion. Obviously, it cannot deal with all phases of the matter or adequately discuss more than one or two of the cases cited. We can undertake little more than to

state the pivotal facts, the legal questions presented by the errors assigned, and, briefly, our conclusions.

In January, 1930, the Washington Electric Company received from the Federal power commission a license to construct a hydro-electric project in the Columbia river at Rock Island, about twelve miles downstream from Wenatchee, Washington. Here, the river is divided into two channels by an island, and it was proposed to dam each channel and thus create a reservoir which would raise the upstream water level for a distance of about twenty miles. The license was granted, and afterwards assigned to Puget Sound Power & Light Company. The license is a document of formidable length. Portions of it will be quoted later in the opinion.

At the point where the dam was to be built, the Great Northern Railway Company's railroad ran along the east bank of the Columbia. Some of its trackage above the dam would be overflowed, and its property rights otherwise disturbed, by the creation of the reservoir. It was necessary for the power company to adjust these matters by contract or to bring condemnation proceedings.

Negotiations were had which ripened into an agreement on April 15, 1931, although it appears that the formal instrument was not delivered, and did not become effective, until June 13th. This contract is of such great pertinence to the questions involved in the appeal that it is unfortunate that it cannot be quoted in its entirety. It is of such length that this is impossible. We quote only those portions which tend to bring into sharp relief the principal question presented as to its construction, which is, whether or not it contemplated loss, damage, etc., to the railway company generally, that is, both above and below the dam,

or only that which it might suffer above the dam. The introductory portion of the contract reads as follows:

"AGREEMENT, Made this 15th day of April, 1931, by and between GREAT NORTHERN RAILWAY COMPANY, a Minnesota corporation (hereinafter called the 'Railway Company'), and WASHINGTON ELECTRIC COMPANY, a Maine corporation (hereinafter called the 'Electric Company').

"The Electric Company, pursuant to Federal Power Commission License for Project No. 943 issued to it on the 21st day of January, 1930, desires to construct, maintain and operate a dam and power house in and across the Columbia River at Rock Island in the State of Washington, for the purpose of generating hydro-electric power. Said dam will raise the water of the Columbia River and its tributary, the Wenatchee River, to an extent which will vary with the amount of water naturally flowing in said Columbia River and with the Electric Company's daily use of said water in the operation of said plant, and will inundate certain areas of the Railway Company's property along the river. The Electric Company desires to acquire the right so to inundate the Railway Company's property and to agree with the Railway Company upon the compensation to be made therefor.

"The extent that said dam will change the natural water level of the Columbia River and its tributary, the Wenatchee River, and will inundate the property of the Railway Company, as calculated by the Electric Company for various rates of river flow, is shown by the maps marked respectively Exhibits 'A', 'B' and 'C', and the longitudinal profiles marked respectively Exhibits 'D' and 'E', hereto attached and made a part hereof.

"In consideration of the premises and of the mutual dependent covenants herein contained, the parties agree:   . . ."

Then follows 1. (a), (b), (c), (d), and (e), defining, with particularity, the flowage easements granted. The contract continues:

"2. The foregoing flowage easement is granted subject to the right of the Railway Company, its successors and assigns, to use and improve said property for all other purposes.

"3. *In consideration of the foregoing grant the Electric Company agrees*:

"(a) To pay the Railway Company upon delivery of this contract the sum of Twenty-five Thousand Eight Hundred Eighty-five Dollars ($25,885), the agreed value of the right to inundate those portions of the Railway Company's right of way and land defined and shown in shaded white as Exhibits 'A', 'B' and 'C', hereto attached, considered separately from the improvements thereon;

"(b) To pay the Railway Company for all damages to its roadway, structures, facilities and improvements, occasioned by the construction, maintenance or operation of the Electric Company's dam or the works appurtenant or accessory thereto;

"(c) To pay the Railway Company for the cost and expense of all changes and additions to its roadway, structures, facilities and improvements at any time made for the purpose of enabling the same to withstand, avoid or reduce damage caused or proximately threatened by the construction, maintenance or operation of the Electric Company's dam or the works appurtenant or accessory thereto;

"(d) To reimburse, indemnity and save harmless the Railway Company of and from all liability to other parties (including its employes) which it may at any time or in any manner incur or suffer as a result of the construction, maintenance or operation of the Electric Company's dam or the works appurtenant or accessory thereto;

"(e) *To pay the Railway Company for all other loss, cost, damage or expense of every kind and nature at any time or in any manner caused by the construction, maintenance or operation of the Electric Company's dam or the works appurtenant or accessory thereto.*

"*Without in any way limiting the generality of the foregoing obligation, the Electric Company, in consideration of the grant of said flowage easement, agrees*

*also to bear all expense and to perform all obligations specifically assumed by it elsewhere in this contract.*

"4. The Electric Company agrees to do the following work and assume the following obligations at its own sole cost and expense in order to protect the property of the Railway Company from the anticipated effects of the Electric Company's project; . . ." (Italics in the foregoing quotation and elsewhere in this opinion are supplied.)

This is followed by many pages of specifications concerning construction changes, principally, if not wholly, above the dam, to be made by the electric company for the benefit of the railway company or by the railway company itself at the electric company's expense.

It is further provided in paragraph 6:

"The obligation of the Electric Company to reimburse the Railway Company for expense caused by the increased water levels and/or changed water conditions resulting from the Electric Company's project shall continue without limitation of time so long as said project shall exist, and shall apply to all structures, facilities and improvements of the Railway Company affected by said project, whether now built or hereafter constructed."

The railway company is further insured permanent protection by the provisions of paragraph 12:

"This agreement shall inure to and be binding upon the successors and assigns of the parties, and the grant of flowage rights hereby made by the Railway Company to the Electric Company is expressly conditioned upon the performance by the Electric Company, its successors and assigns, of all and singular the terms, conditions, covenants and agreements herein set forth, to be by them kept and performed. Should the Electric Company, its successors or assigns, fail to make any payment, when due, which it is obligated to make by this agreement, or fail in any other respect to perform this agreement, and such default continue

for six (6) months after notice in writing of intention to terminate this contract, given by the Railway Company to the Electric Company, the Railway Company may, at its election, by written notice to the Electric Company, terminate this contract and all rights and privileges herein granted, and may have, repossess and enjoy the premises upon which such flowage rights are granted as of its former estate, and all payments theretofore made by the Electric Company shall be retained by the Railway Company in liquidation of the damages sustained by it prior to such breach of this agreement, but without prejudice to the right of the Railway Company to recover all damages resulting from such breach or thereafter caused by the project of the Electric Company, or to enjoin the Electric Company from committing such damages by the maintenance and operation of said project; . . ."

After securing an amendment concerning the erection of the dam on the western side of the river, the power companies proceeded to construct the project as per license.

In the spring and summer of 1933, at the season of high water in the Columbia, the embankment below the easterly section of the dam, and, on account of the fact that the dam crosses the river at an angle, more or less directly across the river from the westerly section, was eroded and caved badly, making it necessary for the railway company to give slow orders to its trains, to employ large crews of men to shore up the embankment with sandbags as a temporary expedient, and, finally, to make extensive permanent repairs.

In July, 1935, the railway company brought this action to recover the expense to which it had been put by the erosion, alleging it to be the sum of $98,588.07, claiming the erosion to have been solely and proximately caused by the construction and maintenance of the dam, and relying upon the con-

tract of April 15, 1931, and, in the alternative, upon the 10th article of the Federal license, or, perhaps, more accurately speaking, upon 16 U. S. C. A., § 803 (c), which provides:

" . . . Each licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto, constructed under the license, and in no event shall the United States be liable therefor."

The railway company further alleged that the destruction of the embankment constituted a taking and damaging, within the meaning of Art. I, § 16 of the state constitution [ninth amendment], and the fifth amendment to the constitution of the United States.

The defendant companies denied that the contract of April 15, 1931, was in any way relevant, and particularly denied that the erosion was caused by the construction and maintenance of the dam, and set up affirmative defenses the substance of which was as follows:   That the embankment was constructed in the bed and upon the shore lands of the Columbia river, a "navigable water" of the United States, and without the approval of the chief engineer of the war department of the United States or authorization of its secretary of war, as required by law, and that any right or rights the railway company had with respect thereto were subordinate, inferior to, and subject to, the rights of the defendant companies to improve the river for the benefit of navigation under the license from the Federal government; and that, if the erosion of the embankment was, in fact, caused by the construction and maintenance of the dam, it was *damnum absque injuria.*

The defendant companies further set up affirmatively that the erosion occurred because the embankment itself had narrowed the river and increased the

speed of its flow, and they reinforced their denials as to the relevancy of the contract by pleading affirmatively that it concerned wholly loss and damage which might occur above the dam and had no relation whatever to the property or rights of the railway company below the dam.

On October 12, 1935, the jury returned a verdict in favor of the railway company in the amount of seventy-five thousand dollars. Two days later, the power companies filed their alternative motions for judgment notwithstanding the verdict, or new trial. These motions were not ruled upon until August 20, 1937, when the trial court rendered a memorandum decision denying them. A further delay in entering judgment was occasioned by differences over the question of interest, the railway company insisting upon interest from the date the expenses for restoring the embankment were incurred. In a second memorandum opinion, rendered November 12, 1937, the court ruled that the damages were not liquidated until the jury returned its verdict, but that they were thereupon liquidated, and that the railway company was entitled to interest from the date of the verdict. More than two years having passed, judgment was accordingly entered for a total sum of $84,600, and costs to be taxed.

The appellants make the following assignments of error:

"1. The court erred in overruling defendants' motion for nonsuit and their several challenges to the sufficiency of the evidence and in denying defendants' motion for directed verdict in favor of defendants, and in denying defendants' motion for judgment, notwithstanding the verdict of the jury, and in entering judgment in favor of plaintiff in any amount for the following reasons:

"(a) Plaintiff failed to establish ownership of the damaged fill, or the shorelands, or bed of the Colum-

bia River on which the fill was located, or any property right therein sufficient to sustain this action.

"(b) By reason of the violation of the applicable Federal statute (33 U. S. C. A., Sec. 403) the plaintiff has no cause of action for the alleged damage.

"(c) The alleged damage is not an impairment of any property right owned by plaintiff and is nothing more than the incidental consequence of the lawful improvement of the Columbia River in aid of navigation and for the benefit of interstate commerce, for which plaintiff cannot recover.

"(d) The contract of April 15, 1931, does not entitle plaintiff to recover in this action.

"2. The court erroneously included in the judgment the sum of $9,600 as interest from the date of verdict (October 12, 1935) to the date of judgment (November 24, 1937) on the amount awarded plaintiff."

It will be noted that the finding of the jury that the erosion was caused by the erection and maintenance of the dam, and its finding as to the amount of loss occasioned, are not questioned, but it is asserted, on various grounds and for divers reasons, that no legal damage was shown. In order to deal with the questions presented, it is necessary to state additional facts and refer to certain statutes.

The railway company has maintained and occupied its line of railroad along the east bank of the Columbia since the year 1892. Below the site of the dam, the tracks ran between the river and a range of rocky cliffs. In 1924, the state of Washington projected a road along the east bank of the river, and, in order to avoid grade crossings, wished to locate it between the existing railway and the cliffs. There was not room to do so. On July 1, 1924, the railway company entered into a contract which purports to be with the state of Washington:

"AGREEMENT, Made this 1st day of July, 1924, between GREAT NORTHERN RAILWAY COMPANY, a Minne-

sota corporation (hereinafter called the 'Railway Company'), and the STATE OF WASHINGTON (hereinafter called the 'State'), acting by and through the STATE HIGHWAY COMMITTEE (hereinafter called the 'Highway Committee'), and the STATE HIGHWAY ENGINEER (hereinafter called the 'Highway Engineer')."

In this agreement, it was recited that the state desired to acquire a right-of-way for its road upon a portion of the strip of land occupied by the railway, and that the railway company was willing to grant the right-of-way upon the agreement of the state to construct a new embankment for it to the eastward. The instrument contains apt recitals and covenants to this end, and was executed by the then officers of the railway company and the state highway committee of the state of Washington, consisting of its then governor and state highway engineer.

Pursuant to this agreement, the state highway department built the new embankment by day labor, the railroad tracks were shifted to the westward, and the railway company began operating its trains over a portion of the new roadbed in 1926, although the shifting of its tracks was not completed until 1929. It is a portion of this embankment that was carried away. There seems to be substantial agreement between the litigants that, at the widest point along the dam area, the embankment was extended seventy-five or eighty feet toward the river. It is said in appellant's brief that it appears in evidence that 36.5 per cent of the fill was in the channel of the river below the line of low water and 51.8 per cent between that line and ordinary high water. If so, it follows that 88.3 per cent of the fill was located below the line of ordinary high water, and but 11.7 per cent of the fill above that line. It is also said that, at one point, the fill reduced the cross-section area of the river 11.36 per cent. There appears to be some little dispute con-

cerning the accuracy of this data, but, for our present purpose, we give the appellants the benefit of their own figures.

There can be no question but that the Columbia river is a "navigable water" of the United States. No one, therefore—not even the state—had the right to put a fill in its channel without the approval of the chief engineer of the war department and the authorization of the secretary of war. 33 U. S. C. A., § 403. *F. D. Gleason Coal Co. v. United States,* 30 F. (2d) 22.

The railway company secured no such approval or authorization, and, although it appears that it was the state that put in the fill, and it is contended by the respondent that there is no direct evidence that the state did not secure such approval and authorization, we have no doubt that it did not. It was made plain from the very beginning of the action, that is, in the appellants' pleadings, that they relied strongly upon a lack of authorization for the fill, and, if authorization had ever been secured by anyone, evidence to that effect would, undoubtedly, have been produced.

The appellants correctly point out that the railway company acquired no legal title to that part of the bed of the river on which the fill was constructed by reason of its agreement with the state. Nevertheless, at the time the embankment was eroded, in the summer of 1933, the railway company was, *as to the state,* something more than a mere occupant by sufferance. Its agreement with the state had been under performance for seven years. It had acquired the benefits of the railway company's right-of-way and had enjoyed them for the greater part of that period. The state could not oust the railway company from the occupancy of its shorelands merely because it had never conveyed legal title. As against the state, the circumstances show a right of occupation

in the railway company which equity would unquestionably protect and maintain, upon the theory of estoppel *in pais.*

As to the United States, however, the situation is very different. As to it, the railway company's occupation was by mere sufferance. It could be driven out of or off the river by the United States and without compensation. *United States v. Chandler-Dunbar Water Power Co.,* 229 U. S. 53, 57 L. Ed. 1063, 33 S. Ct. 667. See, also, *Delaware R. Co. v. Weeks,* 293 Fed. 114. The case last cited contains a valuable list of citations at page 120.

It is undoubtedly true, as asserted by the appellants, that, had the United States constructed the Rock Island project, it would not have been liable to the respondent for the destruction of the embankment. This is because every part of the river was subject to its right to improve navigation. The appellants contend in their brief:

"The alleged damage is nothing more than the incidental consequence of the lawful exercise of the paramount authority of the United States to improve the Columbia river in the interests of navigation and interstate commerce, for which plaintiff may not recover from either the United States or defendants."

This contention is based upon the fact that the United States, in granting the license, stipulated that the project should be planned so as to allow for further construction of navigation facilities, inserted a reservation of a right-of-way through the dam for locks, and bound the licensee to furnish power for their operation. Appellants call attention also to such recitals in the license as the following:

"WHEREAS, the Commission has found that said project, as hereinafter described, will be best adapted to a comprehensive scheme of improvement and utilization of said waterway for the purposes of navigation,

of water power development and other beneficial public uses; and

"WHEREAS, the Commission did on the 16th day of October, 1929, find that the contemplated improvement is desirable and justified in the public interest for the purpose of improving or developing a waterway, namely, said Columbia River . . . for the use or benefit of interstate and foreign commerce, a certified copy of the records of the Commission containing such finding being hereto attached; and

"WHEREAS, the Licensee, on the 17th day of January, 1930, pursuant to an authorization of its board of directors, a copy of the record thereof being hereto attached, accepted in writing all the terms and conditions of the Act and of this license;

"Now, THEREFORE, the Commission hereby issues this license to the Licensee for the purpose of constructing, operating and maintaining certain project works necessary or convenient for the development and improvement of navigation and for the development, transmission and utilization of power across, along, from or in the Columbia River, . . ."

But, from the fact that all damage done to structures in navigable waters belonging to private parties is *damnum absque injuria*, when the United States acts directly in improving navigation, it does not follow that the same rule applies when it improves navigation through the medium of a licensee. The licensee in such a case gets no part of the sovereign power over navigable waters which belongs to the Federal government. He gets only those powers which are specifically granted in the license, and no more, and they are not only subject to strict construction, but also to definite limitations prescribed by the water power statute. This is definitely shown in the opinion of the supreme court of the United States in *Ford & Son v. Little Falls Fibre Co.*, 280 U. S. 369, 74 L. Ed. 483, 50 S. Ct. 140. See the discussion of this

case in *United States v. Central Stockholders' Corp.*, 52 F. (2d) 322, beginning at page 330.

Henry Ford & Son, Incorporated, was a riparian owner of the Mohawk river above its confluence with the Hudson. At this point, which was above a Federal dam in the Hudson, it owned a dam and developed power for use in its factory. The Little Falls Fibre Company procured a license from the Federal power commission under the Federal water power act, just as the appellants did in this case. The license permitted it to place flash-boards on the crest of the government dam, which raised the water to such an extent as to materially reduce the power developed by the Ford plant. In reviewing the matter on certiorari, the supreme court said, in part:

"To avoid this liability petitioner relies on the Federal right or immunity specially set up by its answer, that the Hudson and Mohawk are navigable rivers; that all of the acts complained of were done under the license and authority of the Federal Power Commission and under regulations of the Secretary of War, authorized by the Water Power Act; that the license and the acts of petitioner authorized by it were found by the Commission to be desirable and justified in the public interest for the purpose of improving and developing the Hudson River for the benefit of interstate commerce, and that the petitioner, acting under the license, is an agency of the Federal government, in the exercise of its power to regulate commerce and navigation."

This is substantially the same theory advanced by the appellants in this case. It appears that Ford & Son, Incorporated, attempted to meet the contention by alleging and attempting to prove that the flash-boards did not, in fact, improve navigation in any material way, and, therefore, the commission acted without its jurisdiction in granting the license. The supreme court, however, said:

"Whether the Commission acted within or without its jurisdiction in granting the license, and *even though the rights which the respondents here assert be deemed subordinate to the power of the national government to control navigation, the present legislation does not purport to authorize a licensee of the Commission to impair such rights recognized by state law without compensation.* Even though not immune from such destruction they are, nevertheless, an appropriate subject for legislative protection."

The court further pointed out that § 10 (c) of the act (16 U. S. C. A., § 803 (c)), provides that the licensee "shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation" of the licensed project, and by § 6 (16 U. S. C. A., § 799), all licenses are required to be "conditioned upon acceptance by the licensee of all the terms and conditions of this chapter," and held that one who accepts such a license agrees, under the provision of § 6, to recognize and protect all rights which others may have under the laws of the state.

It follows that the respondent in this case is entitled to recover in this action by virtue of the provisions required by law to be in the appellants' license for the protection of others and which are, in fact, therein contained as Article 10 thereof, *if* the respondent had an interest in the embankment of such a character as to be considered property under the laws of the state of Washington. Whether or not the respondent had such an interest will be discussed later in the opinion.

The trial judge held that the contract of April 15, 1931, was not confined to matters above the dam, but was applicable to the area below the dam as well. His reasons are stated in a memorandum opinion of such length that they cannot be reproduced here. We have, from our examination, arrived at the same con-

clusion. It is, no doubt, true, as appellants contend, that the principal object of the contract was to secure the flowage rights above the dam. These rights are granted in paragraph 1. (a), (b), (c), (d), and (e). The contract then continues: "3. In consideration of the foregoing grant the Electric Company agrees: . . ." Here follow sub-paragraphs (a), (b), (c), (d), and (e), which recite the considerations for the grant. These we have quoted in full early in the opinion. We re-quote (e), the most material to our present inquiry:

"(e) *To pay the Railway Company for all other loss, cost, damage or expense of every kind and nature at any time or in any manner caused by the construction, maintenance or operation of the Electric Company's dam or the works appurtenant or accessory thereto.*

"*Without in any way limiting the generality of the foregoing obligation,* the Electric Company, in consideration of the grant of said flowage easement, agrees, also, to bear all expense and to perform all obligation specifically assumed by it elsewhere in this contract."

The trial court, in passing upon the motion for judgment notwithstanding the verdict, was in this position: The jury had found that the embankment had been destroyed by the construction, maintenance, and operation of the appellants' dam. Here was a written promise of appellants, given as consideration for flowage rights above the dam, that they would pay the railway company for "all other loss, cost, damage or expense of every kind and nature at any time or in any manner caused by the construction, maintenance, or operation" of the dam. Did the respondent suffer any loss, cost, damage, or expense of any kind or nature? Was it compelled to show technical title to the embankment in order to recover on the con-

tract, or was it sufficient to prove that, without let or hindrance from anyone, it had, for seven years, run its trains over that embankment as an integral link in a great interstate railway roadbed, and, but for anything that was shown, could, and would, have continued to do so indefinitely? Surely, the respondent suffered a real and actual loss and was put to cost and expense, and this, altogether without regard as to whether or not it had any technical title to the embankment or any right, as against the United States, to be in the river.

It is contended, however, that, if the contract be held to cover this loss, then it is void as against public policy; and, along the same line, it is further contended that one will not be permitted to found an action upon his own wrong. In view of the fact that it is unlawful to put a fill in navigable waters of the United States without the prescribed governmental authorization, we suppose that, if A should contract with B to make such a fill, governmental authorization being absent, A could refuse to perform the contract, on the ground that it was void as requiring him to do an illegal act If, in this case, the electric company had contracted to physically replace the fill, and no governmental authorization could be secured, it might, perhaps, lawfully refuse to perform upon the same theory. But that is not the contract involved. The contract merely insures reimbursement for loss, cost, damage, or expense.

Both the state and Federal courts lend their aid to persons in somewhat the same situation as the respondent when their possessions are tortiously injured. *Fowler v. Harrison,* 39 Wash. 617, 81 Pac. 1055; *Gring v. Ives,* 222 U. S. 365, 56 L. Ed. 235, 32 S. Ct. 167. In the latter case, a marine railway projected beyond the harbor line into navigable waters where

it had no lawful right to be. It was run into recklessly and injured by a tugboat. Its owner (if he may be rightly called the owner, which the appellants would deny) was allowed to recover damages. In speaking of this case in *Greenleaf Johnson Lumber Co. v. Garrison*, 237 U. S. 251, 59 L. Ed. 939, 35 S. Ct. 551, the court said:

"The contention of the tugboat owner was practically that the railway was an outlaw subject to be destroyed by anybody, although it had been erected by authority of the State and its existence indulged by the Secretary of War. Manifestly the contention was without any merit whatever."

In the instant case, the embankment had been erected not merely by authority of the state; it was erected *by* the state, and its existence indulged by the secretary of war for a period of years.

It is true, as appellants point out, that the cases cited are cases in tort, but, if the courts protect such property (if property it may be called) by entertaining actions in tort, there would seem to be no logical reason, founded in public policy, why they should refuse to entertain actions upon contracts made for protection of such property.

When courts hold a contract illegal as against public policy, they ordinarily deny relief to all parties thereto. We take it that the appellants do not mean that the contract of April 15, 1931, is illegal in that sense. Surely, they would claim to be entitled to the court's protection of their flowage rights if those rights were in any way threatened. The appellants really contend for what, for want of a better term, we may call a kind of unilateral illegality. This, we think, should be kept in mind in deciding the question raised; for, to grant the appellants' contention would have the effect of utterly destroying a portion of the consideration which the appellants agreed to furnish the rail-

way company in exchange for the grant of the flowage rights.

The question presented is: Has the railway been guilty of such wrongful conduct in the premises that the court ought to refuse it relief, upon the ground that, to grant it, would amount to a judicial sanction of wrongdoing, to the manifest public disadvantage? In deciding such a question, a court will, and should, examine and take cognizance of decided cases dealing with analogous situations. A great number of such cases are cited in the briefs. But, in the end, the court's decision must be made upon the consideration of the particular facts before it. Upon such consideration, we find that the fill project originated with the state, that the state actually constructed it, and that the railway did no more than occupy it, when constructed, and, primarily, to accommodate the state.

Nor did the railway company seek the contract which it sues upon. That transaction was initiated by the appellants, to serve their own purpose. The contract sued upon came into being long after the embankment was constructed in the river and had long remained there without objection from anyone or from any source. It had nothing to do with the embankment being built in the river or with its remaining there. In fact, the relationship of the contract sued upon to that situation is so incidental and accidental that it can scarcely be said to be even collateral. We find no adequate reason to deny appellants relief on the ground of public policy.

Furthermore, in view of the fact that the verdict of the jury must be deemed to constitute a finding that the construction and operation of the dam caused the destruction of the embankment, we think that the respondent would have been entitled to judgment on the verdict even if the contract of April 15, 1931, had

never been made. We stated earlier in the opinion that the case of *Ford & Son v. Little Falls Fibre Co.*, 280 U. S. 369, 74 L. Ed. 483, 50 S. Ct. 140, establishes the railway company's right to recover, if it had an interest in the embankment of such character as to be considered property, under the laws of the state of Washington. We think it had such an interest.

The appellants correctly point out that the railway company cannot possibly be held to have had title to the ground upon which the fill was built. This is not determinative, unless it can reasonably be contended that, when Congress provided that the licensee, under the Federal water power act, "shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation" of the licensed project, it had in contemplation damage only to those things held in absolute ownership, that is, property in the Blackstonian sense, viz., things which one has the right to hold, possess, and enjoy to the exclusion of any other individual in the universe. In so far as we are advised, the bed of a navigable river of the United States has never been susceptible of such ownership. In most of the states, a deed to upland upon a navigable river is said to carry the title to the middle thread. *United States v. Chandler-Dunbar Water Power Co.*, 229 U. S. 53, 57 L. Ed. 1063, 33 S. Ct. 667. In Washington, this is not the case, due to the state's assertion of ownership in § 1 of Art. XVII of the constitution:

"The state of Washington *asserts its ownership* to the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide in waters where the tide ebbs and flows, and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes: Provided, that this section shall not be construed so as to debar any person from asserting his claim to vested rights in the courts of the state."

Note the words, "asserts its ownership," that is, its property right, and we think no one would deny that the interest which a riparian owner has in the bed of the river, in those states recognizing riparian rights, is property. In *United States v. Chandler-Dunbar Water Power Co., supra,* the supreme court of the United States speaks of that interest as a qualified title. Yet, the riparian owner has, and this state has, at the very most, no more than the right to possess, use, and enjoy the bed of a navigable river as against all the world, *except the government of the United States.*

█ We think that the situation of the railway company, at the time the embankment was destroyed, was, in spite of its lack of a deed from the state, for all practical purposes, the same. It was then in possession of, and using, the embankment, and it had the right to continue to possess, use, and enjoy it as against all the world, except the government of the United States.

For the purpose of this action, as was definitely held in *Ford & Son v. Little Falls Fibre Co., supra,* the question as to what is property is controlled by the laws of the state. Our decisions have given the word "property" a very broad meaning. *State ex rel. Wilson v. Grays Harbor & P. S. R. Co.,* 60 Wash. 32, 110 Pac. 676; *Harris v. Johnson,* 75 Wash. 291, 134 Pac. 1048; *Great Northern R. Co. v. State,* 102 Wash. 348, 173 Pac. 40, L. R. A. 1918E, 987; *Bank of Fairfield v. Spokane County,* 173 Wash. 145, 22 P. (2d) 646; *York v. Stone,* 178 Wash. 280, 34 P. (2d) 911.

We have no hesitancy in holding that the respondent, as to the appellants at least, may be regarded as having a property right in the embankment. We may say, in passing, that we think the courts of the United States would so hold. In *Gring v. Ives, supra,* one who, without permission, maintained a marine railway in the bed of a navigable river, was permitted to re-

cover damages against the owner of a tugboat who recklessly damaged it, and the measure of his recovery was the amount required to replace the marine railway in its former condition. One who stands in such a relation to a tangible thing as to be able to recover damages with respect to an injury inflicted upon it, measured by the loss of value so caused, must, of necessity, we think, be regarded as having a property interest in that thing.

We hold, therefore, that the trial court committed no error in denying appellants' challenges to the sufficiency of the evidence and their motions for nonsuit, for directed verdict, and for judgment notwithstanding the verdict, but we are of the opinion that it erred in including interest in the judgment from the date of the verdict.

In *Ferber v. Wisen*, 195 Wash. 603, 82 P. (2d) 139, a case decided since the trial court rendered its decision in the instant case, it is pointed out that, where no interest is stipulated for, its allowance is not, strictly speaking, an allowance as interest, but as damages on account of default, and that the reason no allowance is made on unliquidated demands is because the person against whom the demand is made does not know what sum he owes and, therefore, cannot be in default for not paying.

In the instant case, upon the return of the verdict for seventy-five thousand dollars in respondent's favor, the appellants could not have legally satisfied the respondent's demand by sending it that sum or by paying it into the registry of the court. The respondent's demand was for upwards of ninety-eight thousand dollars. It was open to it to move for a new trial on the ground of inadequacy. Furthermore, the appellants were entitled to test the verdict, as they did, by filing motions for judgment notwithstanding the ver-

dict or for a new trial. It seems clear that the appellants did not know, and could not know, what sum they owed and might safely pay until the court approved the verdict and converted it into a judgment. They were, therefore, not in default during the period for which the allowance was made.

Some contention is made to the effect that, since the appellants contracted to reimburse the respondent for all loss and damage, and, since the respondent was deprived of the use of the money which it expended for restoring the embankment for a considerable period of time, it ought to receive an interest allowance. But this would amount to inserting a stipulation for interest into the contract by implication.

The judgment appealed from is modified by striking therefrom the allowance of interest on the verdict from October 12, 1935, until the judgment was entered on November 24, 1937, such allowance amounting to $9,600. As so modified, the judgment will be affirmed.

STEINERT, C. J., HOLCOMB, BEALS, MILLARD, GERAGHTY, and SIMPSON, JJ., concur.

BLAKE, J. (dissenting in part)—I cannot acquiesce in the disallowance of interest from date of verdict. As I see it, the action is, in essence, for compensation for the taking and damaging of property for public use, in contemplation of Art. I, § 16, of the state constitution. See *Conger v. Pierce County*, 116 Wash. 27, 198 Pac. 377, 18 A. L. R. 393. It is the general rule in such cases that interest is chargeable from date of verdict. *North Coast R. Co. v. Aumiller*, 61 Wash. 271, 112 Pac. 384. I see no reason for making an exception to the rule in this case.

MAIN, J., concurs with BLAKE, J.