**PUBLIC UTILITY DISTRICT NO. 1 OF PEND OREILLE COUNTY,** Appellant,

v.

**CITY OF SEATTLE,** Appellee.

**CITY OF SEATTLE,** Appellant,

v.

**PUBLIC UTILITY DISTRICT NO. 1 OF PEND OREILLE COUNTY,** Appellee.

**No. 20193.**

United States Court of Appeals Ninth Circuit.

Aug. 28, 1967.

Rehearing Denied Oct. 25, 1967.

Alfred L. Newbould, A. C. Van Soelen, Corp. Counsel, G. Grant Wilcox, Asst. Corp. Counsel, Richard S. White, William A. Helsell, Sp. Counsel, Seattle, Wash., for appellee-appellant, City of Seattle.

Before HAMLEY and MERRILL, Circuit Judges, and BYRNE, District Judge.

MERRILL, Circuit Judge.

Seattle brought this action to condemn properties owned by appellant Public Utility District (PUD) pursuant to the Federal Power Act, 16 U.S.C. § 814 (1964).

The question presented is whether the holder of a Federal Power Commission license to construct a hydroelectric project upon a navigable stream must compensate the owner of shorelands and, for power site values, the owner of adjoining uplands, needed for the project.

Appellant PUD is a municipal corporation organized and existing under the laws of the State of Washington, its boundaries coextensive with the boundaries of Pend Oreille County. It operates electric utility properties for the generation and transmission of electric power for sale. PUD's lifeline is the Pend Oreille River, a navigable stream, flowing in a generally northerly direction from the State of Washington into British Columbia. Beginning in 1952, pursuant to a license issued by the Federal Power Commission, PUD constructed its Box Canyon Dam project, located on the Pend Oreille River 19 miles south of and upstream from the Canadian border.

Some years prior to this, hydroelectric studies of the river had been conducted by engineer Hugh L. Cooper, which impressed him with the suitability as a dam site of "Z Canyon" located 17 miles downstream from Box Canyon and 2 miles upstream from the Canadian border. By 1916 Cooper had acquired various parcels of land and rights, and in 1928 he secured a preliminary permit from the FPC and submitted plans for the construction of a hydroelectric project at Z Canyon. In 1936 his appli-

Clarence C. Dill, Ennis & Klobucher, William Ennis, Spokane, Wash., for appellant-appellee, Public Utility District.

cation for a license was denied without prejudice. In 1953 his properties and rights, together with plans and engineering data, were acquired by PUD. They included fee title to a parcel of upland or fast land at Z Canyon, being the proposed site of the Z Canyon power plant, and either fee title or a perpetual easement for flooding in shorelands extending from beyond Box Canyon, downstream (north) to a point near the Canadian border.[1] These lands and rights are the subject of this suit.

Six months after PUD had acquired the Cooper properties the City of Seattle applied to the FPC for a preliminary permit to explore the feasibility of a hydroelectric project to be constructed on the Pend Oreille River a mile downstream from Z Canyon at a site known as Boundary. In August 1954 the City was granted a three year preliminary permit. Discussions of the possibility of a joint operation were had by PUD and Seattle, but in 1957 the City separately applied for an FPC license for its proposed Boundary project. PUD intervened in opposition and filed a competing application for a license for its proposed Z Canyon project. The applications were consolidated for hearing, since the two projects are mutually exclusive. After an extended hearing and a comprehensive decision by the examiner in favor of the Boundary project, the FPC on July 10, 1961, issued its order granting a license to Seattle and denying PUD's application. 26 F.P.C. 54 (1961). The Commission's order was affirmed by the Court of Appeals for the District of Columbia. Public Utility Dist. No. 1 of Pend Oreille County v. FPC, 113 U.S.App.D.C. 363, 308 F.2d 318 (1962), cert. denied, 372 U.S. 908, 83 S.Ct. 719, 9 L.Ed.2d 716 (1963). Seattle commenced this suit March 8, 1963, for condemnation of those parts of PUD's properties needed for the Boundary project.[2]

At pretrial conference the issue was raised as to Seattle's right as a federal licensee to assert the Government's dominant navigational servitude. The District Court tentatively ruled that it could not, and that PUD might offer evidence of the value of its shorelands and flow easements, including water power value, and the power site value of its upland. Upon trial PUD did so, but the court struck all evidence of values attributable to water power for the reason that PUD had not proved such value by any permissible standard. (It had hypothesized a fully and profitably operating power plant and presented testimony on the value of the lands and rights in question to such an operation.)

The court found:

"The highest and best use of the PUD properties sought to be condemned in this action is for hydroelectric purposes."

It further found, however:

"The testimony of power site value as expressed by witnesses for the defendant having been stricken, the only evidence in the record as to value is that testified to by witnesses for the plaintiff, which includes no power site value. Based upon the only evidence as to value admitted in this cause, the fair market value of the property and property rights sought to be taken * * * is $16,000."

The court specifically assigned to the upland taken the value of $1430, and to an easement for a gaging station and measuring cable the nominal sum of $1. The balance, $14,569, is the value attached to the shorelands and easements. Judgment was entered accordingly.

From this judgment cross-appeals have been taken. PUD contends that the court

---

1. Uplands are those above the mean high water mark, while shorelands are between the line of navigability of the river and the mean high water mark. The State of Washington had sold Cooper fee title less mineral rights to some of these shorelands; it had sold him the described easement in the remainder, retaining the fee.

2. Seattle condemned all the shorelands up to Box Canyon, 82 acres out of the 212 acre upland parcel, and a gaging station easement.

erroneously struck its evidence of power site value. Seattle contends that no value at all should have been given to the shorelands and flow easements, and that judgment accordingly must be reduced to $1431.

### I.  SEATTLE'S CROSS-APPEAL.

We first discuss the contentions of Seattle: that no value at all should be assigned to the shorelands or to the power-site attributes of the taken uplands.

It is conceded that this would be the necessary result had the Boundary project been undertaken by the United States itself and had the United States been the condemnor. The issue is whether the situation is different when a power project and condemnation are undertaken not by the United States but by a licensee of the Federal Power Commission.

### A.  *Shorelands*

We turn first to the matter of shorelands.

■ The Government's dominant navigational servitude is the power, in aid of navigation, to utilize the stream bed and shorelands of navigable waters up to the ordinary high water level. In United States v. Twin City Power Co., 350 U.S. 222, 224, 76 S.Ct. 259, 261, 100 L.Ed. 240 (1956), the Court states:

"The interest of the United States in the flow of a navigable stream originates in the Commerce Clause. That clause speaks in terms of power, not of property. But the power is a dominant one which can be asserted to the exclusion of any competing or conflicting one. The power is a privilege which we have called 'a dominant servitude' * * *."

Later the Court refers to the servitude as an "easement of navigation." 350 U.S. at 228, 76 S.Ct. 259.

Explaining the effect of an exercise of the power, the Court in United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 62, 33 S.Ct. 667, 57 L.Ed. 1063 (1913), states that governmental use of the river bottom for purposes of navigation is not a taking of private property for public use, since "the owner's title was in its very nature subject to that use in the interest of public navigation." Thus the Government has "not 'taken' any property which was not primarily subject to the very use to which it had been put * * *." 229 U.S. at 64, 33 S.Ct. at 672.

In United States v. Chicago, M., St. P. & P. R. Co., 312 U.S. 592, 596, 61 S.Ct. 772, 775, 85 L.Ed. 1064 (1941), the Court states:

"The dominant power of the federal Government, as has been repeatedly held, extends to the entire bed of a stream, which includes the lands below ordinary highwater mark. The exercise of the power within these limits is not an invasion of any private property right in such lands for which the United States must make compensation. The damage sustained results not from a taking of the riparian owner's property in the stream bed, but from the lawful exercise of a power to which that property has always been subject."

■ It is thus apparent that the navigational servitude, by its nature, does not destroy or exclude all property rights in the beds and banks of navigable streams. Such rights continue to exist but are held subject to the governmental power in the nature of an easement.

The question then, is whether the Federal Power Act, 16 U.S.C. § 791a et seq. (1964), bestows this governmental power on a licensee.

We first observe that the position of a licensee is distinguishable from that of the United States with respect to furthering of the national interest. By issuance of a license the United States is not acting in the national interest through the licensee to the same extent as it would if it undertook the project itself. The United States acts in the public interest on a national scale; the licensee often on a local scale, on projects thought to be of insufficient dimensions

to warrant the assertion of national power.[3] In many cases the requirements of federal permission and regulation are all that the national interest requires. Frequently the licensee is a privately owned utility or even manufacturer, seeking the license for purposes of profit.

Congress, then, was confronted with the need for a decision; whether or not to exercise (through bestowal upon licensees) the full measure of its constitutional power.

It has not done so expressly, and this fact is of significance. In FPC v. Niagara Mohawk Power Corp., 347 U.S. 239, 249, 74 S.Ct. 487, 493, 98 L.Ed. 686 (1954),[4] the Court states:

> " * * * [T]he exercise of that servitude, without making allowances for preexisting rights under state law, requires clear authorization."

█ This seems to us to be eminently sound. We are here concerned with several important competing interests. On the one hand are state-created property rights, often owned by the state itself.[5] On the other are rate-based benefits to power consumers and power company shareholders, and sometimes benefits to manufacturers. The choice between the two groups of interests involves a value judgment essentially legislative in character. Unless the legislative intent is clear, courts should be slow to adopt a construction the effect of which is a destruction of property rights and of the state's power to create them.

But beyond mere silence as to such legislative intent, language in the Power Act has been interpreted to constitute an express denial of the servitude.

Section 10(c) of the Act, 16 U.S.C. § 803(c), provides in part:

> "Each licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto, constructed under the license, and in no event shall the United States be liable therefor."

This has been interpreted to require compensation for state-created property rights and as being inconsistent with such a destruction of values as would follow assertion of the governmental power. Henry Ford & Son, Inc. v. Little Falls Fibre Co., 280 U.S. 369, 50 S.Ct. 140, 74 L.Ed. 483 (1930).[6]

---

3. § 7(b) of the Power Act, 16 U.S.C. § 800(b), requires the FPC to distinguish between projects which call for development by the United States and those permitting of construction by a licensee. In the former situation a license may not issue. See Udall v. FPC, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967). Furthermore, the authority of the FPC to license projects under the Act extends to ones of very small size. See 18 C.F.R. § 4.60 (1963).

4. In this case and in others later cited the Court was dealing with the Federal Water Power Act of 1920, 41 Stat. 1077, which is now incorporated as Part I of the Federal Power Act.

5. In the present case Seattle has paid the State of Washington $6,000 for the use of the rights the state retained in the shorelands, and apparently more than $40,000 for the use of the waters of the Pend Oreille River for power purposes.

6. In this case and some of those later cited, the Court also dealt with § 27 of the Act, 16 U.S.C. § 821, which protects state-created water rights:

> "Nothing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein."

However, it appears clear from *Ford* that it is § 10(c) of the Act which requires compensation for the taking of state-created property rights, and § 27 serves simply to bring water rights clearly within the scope of § 10(c). In FPC v. Niagara Mohawk Power Corp., 347 U.S. 239, 251, 74 S.Ct. 487, 494, the Court so reads this in stating:

> "The Act treats usufructuary water rights like other property rights."

Cf., the *Great Northern* and *Seaboard* cases cited in n. 7, infra, where § 27 was not at issue.

In FPC v. Niagara Mohawk Power Corp., supra, the Court states:

"Neither [the Act], nor the license issued under it, expressly abolishes any existing proprietary rights to use waters of the Niagara River. * * It makes no express assertion of the paramount right of the Government to use the flow of the Niagara or of any other navigable stream to the exclusion of existing users." 347 U.S. at 250, 74 S.Ct. at 494.

And further:

"Respondent's private property rights are rooted in state law, subject to the paramount rights of the State and Nation. In the instant case, both the State and the Nation have made limited assertions of their superior rights." 347 U.S. at 256, 74 S.Ct. at 497.

In United States v. Twin City Power Co., supra, the Court states:

"The legislative history and construction of particular enactments may lead to the conclusion that Congress exercised less than its constitutional power, fell short of appropriating the flow of the river to the public domain, and provided that private rights existing under state law should be compensable or otherwise recognized. Such were United States v. Gerlach Livestock Co., [339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950)], and Federal Power Commission v. Niagara Mohawk Power Corp., supra, 347 U.S. 239, 74 S.Ct. 487, 98 L.Ed. 686."

These expressions in our judgment reinforce an early ruling of this court on this question. In United States v. Central Stockholders' Corp., 52 F.2d 322, 332 (9th Cir. 1931), we stated:

"The Supreme Court held in the Ford Case, in effect, that it was not the intention of Congress to vest any portion of its sovereign power in the permittee, and, assuming that the Government might have exercised its control over navigable streams by and through a permittee under the Federal Water Power Act, that it was not the intention of the government so to do. On the contrary, the general purpose of the act was to permit what would otherwise be an infringement of the rights of the federal government and an interference with navigation, that is, to permit a purpresture, requiring the permittee, however, to make due compensation where the project involved the taking of private property. To put it in another way, the law expressly recognizes all private rights established and determined by the law of the state and expressly requires the permittee, where it interferes with such rights, to compensate the owners therefor. If we assume, as is contended, that the government in this case might, in the aid of navigation of the San Joaquin river, impound the waters of the tributary streams and feed them into the river in a manner best suited to navigation without regard to the rights of other riparian owners to the waters of the stream for purposes of irrigation, etc., and without compensation therefor, such assumption cannot avail the government because the Ford Case holds that in the exercise of such powers through a permittee under the Federal Water Power Act such permittee must make compensation for private rights so taken."[7]

We do not think that this case (or that of Grand River Dam Auth. v. Grand-Hydro, 335 U.S. 359, 69 S.Ct. 114, 93 L.Ed. 64 (1948), discussed infra), is distinguishable upon the ground that condemnation there was under state law and did not involve an exercise of the federal power of eminent domain granted by the Power Act. The servitude, if it is operative, is not in the nature of a

---

7. To the same effect is Great Northern Ry. Co. v. Washington Elec. Co., 197 Wash. 627, 86 P.2d 208 (1939) cited by the Supreme Court in *Niagara Mohawk.* See also Seaboard Air Line R. Co. v. County of Crisp, Ga., 280 F.2d 873 (5th Cir. 1960), cert. denied, 364 U.S. 942, 81 S.Ct. 460, 5 L.Ed.2d 373 (1961); Union Elec. Light & Power Co. v. Snyder Estate Co., 65 F.2d 297 (8th Cir. 1933).

right to take or acquire property without the giving of compensation. It is, as we have discussed, in the nature of an easement which avoids all need for taking of the rights in question. Thus it does not require condemnation for its exercise. On the contrary, it eliminates the need for condemnation, save perhaps in the capacity of a suit for declaratory judgment.

■ We conclude that Seattle as licensee of FPC may not assert the Government's dominant navigational servitude; that if shorelands are necessary to its projects they must be *taken* in the constitutional sense, and compensation for the taking must follow.

B. *Uplands*

The next question presented is whether, in determining fair market value, the power site value of the condemned uplands may be taken into consideration. It is settled that if the United States itself were the condemnor such values could not be asserted. United States v. Twin City Power Co., supra; United States v. Chandler-Dunbar Water Power Co., supra.

Language in *Chandler-Dunbar* suggests that this is because the assertion of such values amounts to an impermissible claim of a private property interest in the flow of the stream,[8] from which suggestion it might be concluded that such values are in no case proper.

Later cases in clarifying the reason for the rule have shown the error of such a conclusion. These cases recognize that while the running water of a stream is not capable of private ownership, it is susceptible of a right of use, and that such right may add value to the land to which it is appurtenant.

Thus in Grand River Dam Auth. v. Grand-Hydro, 335 U.S. 359, 372, 69 S.Ct. 114, 120, 93 L.Ed. 64 (1948), a condemnation under state law, it is made clear that

as between private parties the Act itself as a relevant factor in determining fair does not serve to eliminate power value market value. The Court states:

"It is clear that the Federal Power Act cannot be said to have so far affected the use of this land for a power site as to destroy or otherwise render valueless the owner's right to use it for that purpose. That Act merely has attached conditions to the use of the land for a power site. The Act seeks to encourage rather than to prohibit the development of power sites. It seeks to preserve or enhance, not to destroy, their value as such.
\* \* \*

"In a voluntary purchase of this land by the petitioner, as a willing purchaser, from the respondent, as a willing and unobligated seller, the value of it as a power site inevitably would have entered into the negotiated price.
\* \* \*

"As between these two corporations seeking to determine the sales price of this land, the Federal Power Act placed no limitation upon their voluntary negotiations."

In that case the Court expressly reserves the question as to the "appropriate measure of value in a condemnation action brought by the United States or by one of its licensees in reliance upon rights derived under the Federal Power Act." 335 U.S. at 373. While the question has now, in *Twin City*, been laid to rest as to the United States, the Court has not yet expressly dealt with the question as to licensees.

We are satisfied, however, that the rule which precludes assertion of power value against the United States does not apply in the case of a licensee; that in the case of the United States it goes hand in hand with the Government's dominant navigational servitude. In United States v. Virginia Elec. & Power

8. The Supreme Court states:
"Ownership of a private stream wholly upon the lands of an individual is conceivable; but that the running

water in a great navigable stream is capable of private ownership is inconceivable." 229 U.S. at 69, 33 S.Ct. 667, at 674, 57 L.Ed. 1063.

Co., 365 U.S. 624, 629, 81 S.Ct. 784, 788, 5 L.Ed.2d 838 (1961) the Court stated:

> "Thus, just as the navigational privilege permits the Government to reduce the value of riparian lands by denying the riparian owner access to the stream without compensation for his loss [citations omitted], it also permits the Government to disregard the value arising from this same fact of riparian location in compensating the owner when fast lands are appropriated."

In *Twin City* the power value is described as one "that inheres in the Government's servitude * * *." 350 U.S. at 225, 76 S.Ct. at 261.

■ The rule, then, as we understand it, is that one may not assert against a condemnor values attributable to a right which the condemnor has power to withhold; for this would be to require the condemnor to pay for the exercise (through the very act of condemnation) of its power to withhold the right.

■ We conclude that as to federal licensees not exercising the Government's navigational servitude, full market value, including power site value, is the proper measure of compensation.

Upon the contentions of Seattle, the District Court was not in error. Upon Seattle's cross-appeal, judgment is affirmed.

## II. APPEAL OF PUD

We turn to the appeal of PUD and its contention that the District Court erroneously struck its evidence of power site value.

Power value may generally be said to be of two types. First, there is the value increment which one engaged in the assembling of lands needed for a power project would be willing to pay in order to be able to include such land in its needed package. Such values typically are established by proof of comparable sales. No proof of such a value increment was presented by PUD, and Seattle's witnesses testified that the taken lands enjoyed no such increment.

Second, there is the highly enhanced value that may attach to the fully assembled land package (and its several parts) due to the fact that the prospective power project is dependent upon use of that package. PUD's proof was limited to value of this sort. Its witnesses valued the properties by capitalizing the earnings of a completed power plant at Z Canyon, subtracting the cost of construction. Their estimates resulted in a value of between seven and nine million dollars for the lands involved.

■ Enhanced value of this sort comes perilously close to being impermissible proof of profit attributable to a frustrated business opportunity rather than to land itself. See United States v. Grand River Dam Auth., 363 U.S. 229, 236, 80 S.Ct. 1134, 4 L.Ed.2d 1186 (1960). At the least there must be a reasonable likelihood that absent the taking the land would, in the reasonably near future, be put to the use in question and that the anticipated earnings would result. United States ex rel. TVA v. Powelson, 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943); Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236 (1934); Continental Land Co. v. United States, 88 F.2d 104 (9th Cir. 1937), cert. denied, 302 U.S. 715, 58 S.Ct. 36, 82 L.Ed. 552 (1937); United States v. Cooper, 277 F.2d 857 (5th Cir. 1960).

The District Court found that while PUD had not yet completed the assembling of its land package, it could be credited with it nonetheless, since it could reasonably be assumed that PUD would be able to complete the assembling by purchase without resort to eminent domain.[9] Nevertheless, the District

9. In determining whether a condemnee would be able to assemble the land package necessary to engage in a certain land use, the possible resort to the power of eminent domain by such condemnee must be disregarded. United States ex rel. TVA v. Powelson, supra. The District Court found that PUD could, by voluntary transfer, have assembled the lands needed for a "low" dam project at Z

Court rejected this type of proof for the reason that it necessarily assumed the acquisition of an FPC license. We agree.

■ Accepting that in a proper case land may be evaluated by capitalization of earnings of the project into which it is to be incorporated,[10] we hold that such methods of evaluation are not proper, since the contemplated use is too remote, when that use requires a federal license which has not been obtained and where the condemnor is the successful competitor for a federal license.

■ Common sense tells us in such a case that the multimillion dollar loss claimed by the condemnee is not due to the taking of a few acres of land but to its failure to qualify for the needed license. To impose this loss upon the condemnor is to require it, as a cost of obtaining its license, to compensate the condemnee for the latter's inability to obtain a license. The winner must pay the loser's losses. The successful licensee, in effect, must assume and make compensation for the very deficiencies which caused failure of the condemnee's application. In our judgment the policy of the Power Act in the public interest requires that such a proposition be rejected.

■ By this ruling we do not hold that the condemnor can use its federal license to destroy pre-existing values. The licensed project should be permitted neither to enhance nor to destroy value of property condemned on its behalf. See United States v. Virginia Elec. & Power Co., supra, 365 U.S. at 636, 81 S.Ct. at 792.

The problem lies with the burden of proving value. Where condemnor and condemnee have competed for a federal license, the prospects of the unsuccessful competitor, as a matter of foresight, must be deemed too speculative to permit him to attach value to the pre-existing likelihood of his succeeding in his efforts.[11]

Upon the appeal of PUD judgment is affirmed.

BYRNE, District Judge (concurring in part, dissenting in part):

I concur with the Court in the portion of the opinion dealing with the appeal of PUD. I am unable, however, to concur in the majority's views as to Seattle's cross-appeal.

It is apparently the view of the majority that reversal on Seattle's cross-appeal would, in effect, overrule United States v. Central Stockholders Corp., 9 Cir., 52 F.2d 322, but as I view the two cases, they are clearly distinguishable.

The *Central Stockholders* case involved a condemnation proceeding in the state court where lower riparians received condemnation grants based on California water law, just as Grand River Dam Authority v. Grand-Hydro, 335 U.S. 359, 69 S.Ct. 114, 93 L.Ed. 64, involved a condemnation proceeding in the state courts of Oklahoma. In both cases it was held that an FPC license holder, proceeding in a state eminent domain action, could not claim the benefit of the dominant navigation servitude of the United States. In *Grand Hydro*, the Grand River Dam Authority, a public agency of the State of Oklahoma, sought to condemn lands owned by Grand Hydro, a private utility. The Authority, while it held a license from the Federal Power

Canyon, but that eminent domain powers would have been required for it to obtain the properties for a "high" dam at Z Canyon, or, of course, for a Boundary site dam. This finding adds to the speculative nature of PUD's offer of proof.

10. See United States v. Eden Memorial Park Ass'n, 350 F.2d 933 (9th Cir. 1965); but cf., 1 Orgel, Valuation Under Eminent Domain §§ 162–63 (1953).

11. PUD also claimed "severance" damages, in relation to its Box Canyon project. But it is clear that what it meant was loss of savings possible from the combined operation by one owner of a Z Canyon project with the Box Canyon enterprise. This stands on the same footing as power site value for the Z Canyon lands.

675

Commission to build its project, chose to condemn the lands in the state courts under state law, rather than to exercise its Section 21 powers. The Oklahoma Supreme Court held, as a matter of state law, power site valuation had to be paid. The United States Supreme Court affirmed on the ground that nothing in the Federal Power Act could be said to supersede the state law in this situation. The Court further stated:

"If either the United States, or *its licensees* as such, were seeking to acquire this land *under the Federal Power Act,* it might face different considerations from those stated above. The United States enjoys special rights and power in relation to navigable streams and also streams which affect interstate commerce * * * we express no opinion upon what would be the appropriate measure of value in a condemnation action brought by the United States or *by one of its licensees in reliance upon rights derived under the Federal Power Act.*" (335 U.S. 359, 373, 69 S.Ct. at 121) (Emphasis supplied).

The case now before us, unlike *Grand-Hydro* and *Central Stockholders,* involves a condemnation action brought by a licensee of the United States "in reliance upon rights derived under the Federal Power Act". Judge Merrill, writing for the majority, concedes that no value at all should be assigned to the shorelands or to the power-site attributes of the taken uplands if the United States, itself, were the condemnor. Why the distinction between the United States and a licensee of the United States? The Supreme Court makes no such distinction in *Grand-Hydro.* The distinction made by the Supreme Court is between actions brought in state courts under state law and actions brought "in reliance upon rights under the Federal Power Act".

Surely Congress did not intend that added heavy initial construction costs should burden the users of the power merely because a licensee undertook the construction rather than the federal government. This is particularly signifi-

cant since Congress retains the right to take over a licensed project at the expiration of the 50 year license by paying the net investment to the licensee and, thus, has a direct interest in keeping construction costs to a minimum (See Sections 6, 10 and 14 of the Act.)

In my opinion, when a licensee chooses to exert the powers granted to it by instituting an action pursuant to Section 21 of the Act, it is entitled to the concomitants of that power including the benefit of the federal navigation servitude.

Upon Seattle's cross-appeal, I would reverse.